658 So.2d 1316 (1995)
Travis OLIVER, III and Sally Stowers Oliver, Plaintiffs-Appellants,
v.
CENTRAL BANK, Defendant-Appellee.
No. 26932-CA.
Court of Appeal of Louisiana, Second Circuit.
May 10, 1995.
Writ Denied September 22, 1995.
*1318 Brian E. Crawford, Susan N. Belson, Rex D. Rainach, for appellants.
M. Thomas Arceneaux, Walter B. Stuart, IV, for appellee.
F. Drake Lee, Jr., for AETNA Ins. Co.
Before HIGHTOWER and BROWN, JJ., and GUIDRY, J. Pro Tem.
BROWN, J.
Plaintiffs, Travis and Sally Oliver, brought suit for damages allegedly sustained when flood waters destroyed rental property owned by the Olivers and mortgaged to defendant, Central Bank of Monroe, Louisiana. Defendant's decision to forego renewal of flood insurance on the property was the basis of plaintiff's claims. A jury apportioned fault between the parties and awarded plaintiffs $283,200 which was subsequently applied to a deficiency judgment previously obtained by defendant against plaintiffs. Defendant appeals the judgment while plaintiffs appeal pretrial rulings which excluded certain evidence and limited their claims.

FACTS
Travis Oliver is a successful architect, builder and investor. During the mid-1980's, Mr. Oliver participated with two other investors in the development of Morrison Place Apartments in Monroe, Louisiana. The apartments consist of a multi-building complex located in an area identified as a flood hazard zone under federal guidelines. Initial funding for the project was arranged by one of Mr. Oliver's partners through Deposit Savings Bank of Ouachita Parish ("Deposit Savings"). The mortgage agreement with Deposit Savings included a provision for escrow payments with proceeds used to purchase insurance for the apartments. These funds were used to purchase flood hazard insurance.
Financial difficulties eventually led Mr. Oliver's partners to withdraw from the venture, leaving Mr. Oliver as the sole investor in the Morrison Place Apartments. In 1987, Mr. Oliver negotiated successfully with defendant to move the loan from Deposit Savings and restructure its terms at Central Bank. The parties cannot recall discussing flood insurance during these negotiations. Mr. Oliver testified that he merely assumed that the covenants and terms of the mortgages drafted by Deposit Savings would be carried forward to the new lending relationship with Central Bank. However, the mortgages drafted by defendant did not contain an insurance escrow provision and placed the risk of loss due to hazards on the borrower. At the time, a flood insurance policy previously purchased was still in effect and its mortgage clauses were endorsed in favor of defendant. When neither plaintiff nor defendant paid the premiums due on this existing policy at renewal, the policy lapsed.
*1319 In July 1988, defendant purchased flood insurance coverage for the apartments. In accordance with instructions from the insurance agent, the policy was purchased in plaintiffs' names and listed plaintiffs as the premium payors. The premiums, however, were paid by Central Bank. Plaintiffs were not notified by the bank that the insurance had been purchased nor were they provided with a copy of the policy.
The Olivers began to experience financial difficulties and, with the aid of counsel, renegotiated the terms of their debt at Central Bank in March 1989. The terms of the mortgage documents were not changed, leaving the ultimate responsibility for insuring the property with the Olivers. At the same time, the loan was transferred to defendant's problem loan department and assigned to loan officer Paula Davis.
In January 1990, the Olivers mistakenly received a renewal notice from the flood insurance underwriter. Mr. Oliver, angered over receiving a bill for insurance he had not requested, immediately called the insurance agency that sold the policy. Upon learning of the mistake, Mr. Oliver had the policy reviewed by another insurance salesman and personal friend, Joe Montgomery. Montgomery assured Mr. Oliver that the Morrison Place apartments were adequately insured against flood hazards. Content in this knowledge, Mr. Oliver never questioned defendant about the insurance arrangement nor did he inform the bank that he had learned of the coverage.
In November 1990, Ms. Davis reviewed the Olivers' loan file and noted that the flood insurance was about to expire. Assuming that the borrowers had purchased the insurance, Ms. Davis contacted Mr. Oliver's bookkeeper, Linda Rushworth, and notified her that the policy was up for renewal. Mrs. Rushworth had previously served as liaison between the Olivers and Central Bank and was generally the bank's source for obtaining information for its loan records.
While testimony concerning their conversation is somewhat conflicting, it appears that Mrs. Rushworth made Ms. Davis aware of an engineering report prepared on behalf of Mr. Oliver in January 1990. Ms. Davis requested and subsequently received a copy of the report, which indicated that the 100-year flood plain on which the Morrison Place Apartments were built would soon be altered by a new pumping station. The report also specified the elevation of each of the apartment buildings and stated that they all exceeded elevations required by the Monroe Flood Plain Management Board. A memo prepared by the bookkeeper and attached to the report stated the following:
Please find attached a copy of the engineering report regarding flood elevations on Morrison Place apartments. As per our conversation, the insurance requirements were dropped as far as flood insurance was concerned. Please advise me at your earliest convenience as to the Bank's position on this.
Ms. Davis subsequently learned that the bank had paid all previous insurance premiums. Based upon the engineering report and her conversation with the bookkeeper, Ms. Davis recommended that the insurance be allowed to lapse at the end of 1990. Senior lending officers concurred and the policy was not renewed. Neither Ms. Davis nor the bookkeeper recall discussing the bank's decision to allow the flood insurance to lapse. However, the bookkeeper's record keeping practices and the status of Mr. Oliver's file on the apartments suggest that Ms. Davis and the bookkeeper ultimately resolved the insurance issue.
In April 1991, the Monroe area suffered severe flooding. The bottom floors of the Morrison Place buildings were under water for several weeks and sustained extensive damage. Repair costs were estimated at $475,000. Without insurance, the Olivers were faced with the task of rebuilding the apartments from their own resources; however, their financial condition had deteriorated to the point that they were unable or unwilling to make the repairs. With the cash flow from the apartments lost, the Olivers soon fell delinquent on their $2.6 million loan. *1320 Defendant eventually instituted foreclosure proceedings and the property was seized and sold for $1,317,000 at sheriff's sale. Defendant then obtained a deficiency judgment against plaintiffs for $1,236,242.
In April 1992, plaintiffs filed suit against defendant seeking damages allegedly suffered from the bank's handling of the flood insurance transactions. Plaintiffs alleged negligence, breach of agency obligations, breach of contractual agreements, breach of fiduciary duties, detrimental reliance, abuse of rights as a creditor, and bad faith. Defendant filed a motion for summary judgment which was granted in part, leaving only plaintiffs' negligence and breach of fiduciary duty claims for trial on the merits. A ruling on a motion in limine filed by defendant excluded evidence related to internal bank policy, the Federal Flood Protection Act, and plaintiffs' claims for mental anguish and humiliation.
Following trial, a jury apportioned 60% fault to defendant for damages equal to the estimated cost of repairs totaling $472,000. Plaintiffs were thus awarded $283,200; however, defendant's claim to compensation was recognized and plaintiffs' award was applied to the deficiency balance owed to defendant. Both parties have appealed.

DISCUSSION
Plaintiffs set forth six separate theories for recovery, four of which were disposed of on summary judgment. On appeal, plaintiffs assert error in the summary disposition of these claims. Defendant answered plaintiffs' appeal by asserting error in the trial court's failure to dispose of all of plaintiffs' claims on summary judgment. Thus, defendant in essence challenges the judgment in favor of plaintiffs on their negligence and fiduciary duty claims. Plaintiffs have also appealed the trial court's ruling that excluded certain evidence. The correctness of the trial court's evidentiary ruling, however, depends in part upon the propriety with which plaintiffs' claims were disposed. Accordingly, we start with a review of the disposition of plaintiffs' numerous claims.

The Summary Disposition of Plaintiffs' Claims
A motion for summary judgment is properly granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to a material fact, and that mover is entitled to judgment as a matter of law. LSA-C.C.P. Art. 966. Aufrichtig v. Progressive Men's Club, 25,581 (La.App.2d Cir. 03/30/94), 634 So.2d 947; Leonard v. Stephens, 588 So.2d 1300 (La.App.2d Cir.1991). With this precept in mind, we will review individually each of plaintiffs' claims dismissed via summary judgment.

Bad Faith Exercise of Creditor's Rights
Plaintiffs alleged that Central Bank's foreclosure and deficiency judgment were based upon a default created by the bank itself. As such, plaintiffs argue that the bank exercised its rights under the mortgage in bad faith. The trial court granted summary judgment in favor of defendant on this issue, concluding that plaintiffs' claim had effectively been dismissed by this court in its response to a supervisory writ application made by defendant in an earlier suit seeking a deficiency judgment against plaintiffs.
In the earlier suit, plaintiffs alleged, inter alia, defendant's bad faith as a defense to the bank's petition for deficiency judgment following the seizure and sale of the apartment complex. The trial court ruled against defendant on its motion for summary judgment on the matter. Defendant applied to this court for supervisory writs which were granted and made peremptory. Therein, this court stated that the claims raised by plaintiffs amounted to a contested, unliquidated debt not presently due which could not be used as a defense to liability for a liquidated sum due on a promissory note. This court's limited ruling did not address the merits of plaintiffs' defenses and thus should not have been used as a basis for granting summary judgment in favor of defendant in the instant case.
*1321 In essence, plaintiffs raised an abuse of rights claim premised upon alleged bad faith on the part of Central Bank. The doctrine of abuse of rights has been invoked sparingly in Louisiana. Massachusetts Mut. Life Ins. v. Nails, 549 So.2d 826 (La.1989); Illinois Central Gulf Railroad Co. v. International Harvester, 368 So.2d 1009 (La. 1979). The doctrine is a civilian concept which is applied only in limited circumstances because its application renders unenforceable one's otherwise judicially protected rights. Massachusetts Mut. Life Ins, supra; Truschinger v. Pak, 513 So.2d 1151 (La.1987). To justify application of the abuse of rights doctrine, one of the following conditions must exist:
(1) the exercise of rights exclusively for the purpose of harming another or with the predominant motive to cause harm;
(2) the non-existence of a serious and legitimate interest that is worthy of judicial protection;
(3) the use of the right in violation of moral rules, good faith or elementary fairness; or
(4) the exercise of the right for a purpose other than that for which it was granted.
Illinois Central Gulf Railroad Co., supra.
Plaintiffs allege an abuse of creditor's rights solely on the basis of bad faith. While plaintiffs allege various tortious acts and breaches of contract for the loss of their apartments and their subsequent default on the loan, they do not identify any particular conduct on the part of the bank as evidence of bad faith. Neither do we find such evidence in the record. The term "bad faith" connotes fraud, deception, or sinisterly motivated nonfulfillment of an obligation. The record suggests that defendant foreclosed only when several months of negotiations failed to revive the lending relationship following plaintiffs' default. Defendant's actions were part of a commercially reasonable collection effort and do not rise to the level of bad faith.
Central bank did not abuse its right to foreclose on a seriously delinquent and under-collateralized loan. While we find error in the trial court's reasons for summary judgment on this claim, our review leads us to conclude, nonetheless, that the outcome was correct.

Agency Relationship
The trial court also granted summary judgment against plaintiffs on their claim that Central Bank's action in purchasing flood insurance coverage for the apartments created an agency relationship between the parties. As a basis for its ruling, the trial court noted that both the Olivers and their bookkeeper denied ever expressly appointing Central Bank to act as the Olivers' agent.
An agent is one who acts for or in place of another by authority from the latter. Martin Fuel Distributors, Inc. v. Trans Gulf Fuel, 496 So.2d 473 (La.App. 1st Cir.1986), writ denied, 498 So.2d 753 (La.1986). An agency relationship may be created by express appointment of a mandatary under LSA-C.C. Art. 2985 or by implied appointment arising from apparent authority in order to protect innocent third parties. Anderson Window & Patio Co. v. Dumas, 560 So.2d 971 (La.App. 4th Cir.1990).
Deposition testimony clearly refuted any suggestion that an express agency agreement existed between the parties. Plaintiffs presented no other evidence to support such a claim. Furthermore, the agency relationship alleged by plaintiffs would place defendant in the position of agent and plaintiffs in the position of principals without the presence of an innocent third party asserting reliance on apparent authority. As such, the doctrine of implied agency is not applicable. Plaintiffs' argument on appeal is conclusory and provides this court with nothing new to review. Accordingly, we find no error in the summary disposition of plaintiffs' agency claim.

Breach of Contract
The trial court also granted summary judgment in favor of defendants on plaintiffs' *1322 breach of contract claim. Plaintiffs argued that an obligation arose between the parties when they learned that Central Bank had procured insurance on the apartment complex. As such, defendant's failure to maintain flood insurance coverage was a breach of this obligation. The trial court reviewed the loan documents and noted the absence of any provisions that might obligate Central Bank contractually to procure insurance on behalf of the Olivers. Our review of the loan documents likewise disclosed no written agreement between the parties whereby Central Bank obligated itself to purchase insurance on the Morrison Place Apartments. On appeal, plaintiffs argue that such an obligation arose directly from the law under circumstances where defendant undertook the management of plaintiffs' affairs.
Louisiana law provides the binding force of an obligation upon the occurrence of certain acts or facts. LSA-C.C. Art. 1757. Certain obligations are contracted without any agreement, either on the part of the person bound, or of him in whose favor the obligation takes place. Some obligations are imposed by the sole authority of laws while others arise from an act done by the party obliged, or in his favor. Obligations which arise from fact result either from quasi-contracts, or from offenses and quasi-offenses. LSA-C.C. Art. 2292.
Quasi-contracts are lawful and purely voluntary acts that result in any obligation whatever to third persons and potentially result in reciprocal obligations between the parties. LSA-C.C. Art. 2293. Negotiorum gestio, or the unauthorized management of the affairs of another, results in the formation of a quasi-contract:
When a man undertakes, of his own accord, to manage the affairs of another, whether the owner be acquainted with the undertaking or ignorant of it, the person assuming the agency contracts the tacit engagement to continue it and to complete it, until the owner shall be in a condition to attend to it himself; he assumes also the payment of the expenses attending the business.
He incurs all the obligations which would result from an express agency with which he might have been invested by the proprietors.
LSA-C.C. Art. 2295. Planiol states that a gestion d'affaires is created in every case where a person accomplishes a juridical act in the interest of another without having been charged to do so. 2 M. Planiol, Civil Law Treatise pt. 2, no. 2273 at 308 (11th Ed.La.St.L.Inst. trans. 1959). However, it is essential to negotiorum gestio that the manager be doing another's business, not his own. Burns v. Sabine River Authority, 614 So.2d 1337 (La.App. 3rd Cir.1993), writ denied, 617 So.2d 935 (La.1993); Chance v. Stevens of Leesville, Inc., 491 So.2d 116 (La. App. 3rd Cir.1986), writ denied, 495 So.2d 302 (La.1986).
Plaintiffs suggest that Central Bank's purchase of flood insurance in their names and listing them as premium payors amounted to the management of their affairs and that failure to maintain the insurance violated the obligation to continue such management found in the latter part of LSA-C.C. Art. 2295. However, the record is replete with evidence suggesting that Central Bank procured flood insurance for the protection of its collateral. Clearly the maintenance of the insurance provided a direct benefit to the bank and an indirect benefit to the borrowers who were the recipients of free insurance during the term of the policy. This evidence is sufficient to suggest that Central Bank's actions were predominantly in the interest of managing its own affairs, with only incidental, though substantial, benefit to plaintiffs.
In Illinois Central Gulf Railroad Co. v. Deaton, Inc., 581 So.2d 714 (La.App. 4th Cir.1991), writ denied, 588 So.2d 1117 (La. 1991), plaintiff sought to recover from defendant using the doctrine of negotiorum gestio. An employee for plaintiff railroad was injured when the locomotive he was operating collided with a truck driven by defendant's employee. Fearing a negligence suit, plaintiff settled with its employee for $108,944.50, thereby obtaining a release for both plaintiff *1323 and defendant. Plaintiff then sought to recover from defendant for the sum paid to the employee. On appeal, the court stated that the theory of negotiorum gestio was not applicable to the case because plaintiff acted for its own benefit in negotiating the release, not simply for the benefit of defendant.
In the instant case, defendant provided sufficient evidence to prove that it acted for its own benefit and not solely for the benefit of plaintiffs. Accordingly, plaintiffs' claim that Central Bank acted to manage its affairs was sufficiently refuted to preclude application of the theory of negotiorum gestio. We conclude that summary judgment in favor of defendant on this claim was appropriate.

Detrimental Reliance
Plaintiffs also claimed detrimental reliance as a theory for recovery. In support, plaintiffs argued that it was reasonable for them to believe that Central Bank, like the Olivers' previous lender, would escrow money to pay for flood insurance premiums. Plaintiffs suggest that defendant's action in purchasing the insurance, and their subsequent awareness of this action, constituted a promise to provide insurance coverage on the apartment complex. The trial court concluded that, under the circumstances, no promise was made by defendant to plaintiffs, thereby precluding a claim for detrimental reliance. Plaintiffs' claim was thus denied on summary judgment.
Detrimental reliance is defined in LSA-C.C. Art. 1967: "[a] party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying." A condition precedent to proving a claim for detrimental reliance is demonstrating the existence of a promise upon which the injured party could reasonably rely. Like the trial court, we too find that Central Bank made no promise to the Olivers concerning the maintenance of flood insurance.
First, we note that the relationship between the parties was based upon a multi-million dollar commercial loan package. Mr. Oliver is a builder, architect and contractor with substantial experience in soliciting and acquiring funding for his business interests. The mortgage documents encumbering the Morrison Place Apartments were all signed by the Olivers following lengthy negotiations with Central Bank. The documents executed during the 1989 restructuring of plaintiffs' loan were all reviewed with the aid of counsel. In short, the evidence depicted Mr. Oliver as a savvy and sophisticated commercial loan customer whose own experience and reliance on legal assistance should have left him fully aware of any insurance requirements vis a vis Central Bank. Under these circumstances, Mr. Oliver's alleged assumption that the Central Bank mortgage contained flood insurance escrow provisions is unreasonable. This ill-grounded assumption cannot serve as the basis of a promise by Central Bank to procure and maintain flood insurance on the Olivers' property.
Plaintiffs produced no evidence to illustrate a promise made by Central Bank in their favor. Central Bank never informed the Olivers that it had purchased the insurance. Indeed, the Olivers only learned about the policy when the underwriter mistakenly mailed them a premium notice. This erroneous act on the part of a third party, in the absence of an affirmative act by Central Bank to inform plaintiffs of its actions, does not give rise to a promise by defendant to procure and maintain flood insurance on plaintiffs' behalf.
Finding no promise upon which plaintiffs could justifiably rely, we find no error in the summary disposition of plaintiffs' detrimental reliance claim.

Trial on the Merits: Fiduciary Duty and Negligence
Among plaintiffs' numerous claims, only their breach of fiduciary duty and negligence claims were presented to the jury. On appeal, defendant argues that these claims should have been dismissed on summary judgment along with the remainder of plaintiffs' *1324 claims. Accordingly, any verdict rendered by the jury on these matters is likewise flawed and should be reversed.

Fiduciary Duty
Plaintiffs alleged that a fiduciary relationship arose between the parties when Central Bank acted to procure flood insurance on the Olivers' property. Defendants moved for summary judgment on the issue arguing that a fiduciary relationship between a bank and its customer can be created only by an express, written agreement between the parties. Plaintiffs' never alleged or proved the existence of such an agreement. While expressing reservations about the existence of a fiduciary relationship, the trial court nonetheless denied defendant's motion.
Following the parties' presentation at trial, the jury was given instructions that included the following:
A fiduciary is one who has a duty to act primarily for the benefit of another in certain matters.
The elements of a cause of action when there exists a breach of fiduciary duty or a knowing participation in such are as follows:
(1) a breach by a fiduciary of an obligation to another,
(2) a knowing conclusion or participation in the breach by the fiduciary, and
(3) damages suffered by another as a result of the breach.
Further, a cause of action for breach of a fiduciary duty requires proof of fraud, breach of trust or an action outside the limits of the fiduciary's authority. The burden of proof is on the plaintiff.
Defendant's contention on summary judgment, at trial, and now on appeal concerns the basis for establishing a fiduciary relationship between a bank and its customers. Specifically, defendant cites LSA-R.S. 6:1124 which states in pertinent part the following:
No financial institution or officer or employee thereof shall be deemed or implied to be acting as a fiduciary, or have a fiduciary obligation or responsibility to its customers or to third parties other than shareholders of the institution, unless there is a written agency or trust agreement under which the financial institution specifically agrees to act and perform in the capacity of a fiduciary.
Relying on this provision, defendant points to the absence of any written, express agreement between the parties whereby a fiduciary relationship was established. The trial court made no reference to the requirements of LSA-R.S. 6:1124 in its instructions to the jury, leaving the jury to infer the existence of such a relationship based upon the parties relative positions and the existence of special circumstances.
This court addressed the application of LSA-R.S. 6:1124 in Bespress Inc. v. Capital Bank of Delhi, 616 So.2d 795 (La.App. 2d Cir.1993). Therein, we stated that "[p]ursuant to this statute, unless expressly set forth in a written agency or trust agreement, no fiduciary responsibilities of a financial institution arise toward customers or third parties". Bespress at 798. Plaintiffs failed to prove the existence of any such agreement. In answer to defendant's appeal, plaintiffs suggest that the insurance policy purchased by Central Bank, as a specific written agreement, established a fiduciary relationship between the parties. However, the express terms of the policy establish only a contractual obligation for the underwriter to insure the property from flood damage. We cannot construe the policy as expressly establishing a fiduciary relationship between the bank and its customer.
Plaintiffs have demonstrated no other basis for the creation of a fiduciary relationship under the facts and circumstances of this case. The trial court did not instruct the jury on the correct principles of law. This error was clearly prejudicial because it materially affected the outcome of the trial. When a prejudicial error of law skews the trial court's finding of a material issue of fact and causes it to pretermit *1325 other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential facts de novo. Lasha v. Olin Corp., 625 So.2d 1002 (La.1993), on remand, 91-459 (La.App. 3rd Cir. 03/02/94), 634 So.2d 1354. Applying the correct law, we conclude that no fiduciary relationship existed between the Olivers and Central Bank. Judgment in favor of plaintiffs on this issue is therefore reversed.

Negligence
Finally, plaintiffs asserted negligence in Central Bank's failure to maintain flood insurance and failure to notify them that the coverage had been allowed to lapse. Plaintiffs attempted to prove at trial that Central Bank willingly undertook the task of providing them with flood insurance protection. Once this task was undertaken, Central Bank then had a duty to act in a reasonable and prudent fashion. Accordingly, Central Bank behaved negligently when the insurance was not renewed and plaintiffs were not informed of the lapse of coverage. The jury agreed and found that defendant's actions constituted negligence.
For liability based upon negligence to attach, a plaintiff must prove the following: 1) the defendant owed a duty to plaintiff; 2) the duty owed was breached; 3) the harm caused was within the scope of the breached duty, and; 4) the conduct in question was a cause-in-fact of the resultant harm. Mundy v. Department of Health and Human Resources, 620 So.2d 811 (La.1993). Duty questions, including whether a duty extends to protect a particular plaintiff against a particular harm, are essentially legal questions. Montgomery v. Max Foote Construction Company, 621 So.2d 90 (La. App. 2d Cir.1993). The particular facts and circumstances of each individual case determine the extent of any duty owed. Socorro v. City of New Orleans, 579 So.2d 931 (La.1991).
On appeal, defendant challenges the finding of any insurance-related duty owed to plaintiffs. In part, defendant argues that plaintiffs erroneously rely on the Federal Flood Protection Act ("the Act") as the foundation for a duty on the part of a financial institution to maintain insurance protection on improved, flood-prone real estate serving as collateral. However, we note that the trial court's evidentiary rulings excluded references to the Act and any violation thereof that may have been committed by Central Bank. The jury's finding of negligence was therefore not premised on any duty alleged to have been created by the Act. Nonetheless, we recognize defendant's arguments as a challenge to the existence of a duty owed to plaintiffs in general and will review the trial court findings in that light.
In response to defendant's challenge, plaintiffs again argue that duties can be created where a party assumes responsibility for the welfare of another. Plaintiffs cite Crane v. Exxon Corp., U.S.A., 613 So.2d 214 (La.App. 1st Cir.1992) to support their proposition. Therein, Exxon contracted with Merit for labor to be performed at a Baton Rouge refinery. In a contract between the parties, the burden was placed on Merit for maintaining a safe jobsite and protecting its employees; however, Exxon maintained the right to inspect the job and ensure compliance with Exxon's standards. An Exxon employee performed such inspections and regularly reprimanded a Merit supervisor for various violations of Exxon's safety standards. When a Merit employee was subsequently injured, he brought suit against Exxon. In finding that Exxon owed a duty to the plaintiff, the court found that Exxon voluntarily assumed the task of monitoring the jobsite for violations of safety standards. Because this task was assumed for the purpose of protecting Merit employees, Exxon owed a duty to protect the injured employee.
Certainly, Central Bank voluntarily assumed the task of procuring flood insurance for the Morrison Place apartments. As noted above, however, the purpose behind this action was the protection of the bank's collateral. Central Bank did not act directly to protect the Olivers. Furthermore, Central *1326 Bank never informed the Olivers that it had purchased the insurance coverage, nor were the Olivers ever required to pay the policy's premiums. Central Bank did nothing to convey a message that it had assumed responsibility for protecting the Olivers' interests. Clearly, the bank's actions were directed toward the maintenance of a multi-million dollar asset rather than an effort to appease and protect its customers. The responsibility assumed by Central Bank was not to protect the Olivers, but rather, to protect itself. Under these circumstances, where the purpose behind the voluntary assumption of a task is solely to provide benefit to the actor, we cannot conclude that a duty is created running in favor of an incidental beneficiary of such action.
Having concluded that Central Bank owed no duty to procure insurance on behalf of the Olivers, it likewise follows that defendant had no duty to maintain such protection or advise the Olivers of the policy's termination. The trial court's findings and verdict in favor of plaintiffs on the issue of negligence is therefore erroneous and must be reversed.

Evidentiary Rulings
On appeal, plaintiffs challenge trial court rulings which excluded evidence regarding the Federal Flood Protection Act, internal bank policies, and plaintiffs' non-pecuniary losses. Our findings lead us to conclude that plaintiffs cannot recover under any of the proffered theories of liability. Our conclusion thus renders plaintiffs' appeal on the trial court's evidentiary rulings moot.

CONCLUSION
The trial court's summary disposition of plaintiffs' claims regarding bad faith exercise of creditor's rights, the existence of an agency relationship, breach of contract, and detrimental reliance is affirmed. Judgment in favor of plaintiffs on their fiduciary duty and negligence claims is reversed. Costs are assigned to plaintiffs.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.