768 So.2d 836 (2000)
William G. BROCKMAN, Trustee for the Benefit of the Trusts of Ralph Wesley Brockman, III and Alan West Brockman, Plaintiffs-Appellants,
v.
SALT LAKE FARM PARTNERSHIP, Travis Oliver, III, Managing Partner, Travis Oliver, III, Benjamin M. Peters, and Hardeman Cordell, Defendant-Appellees.
No. 33,938-CA.
Court of Appeal of Louisiana, Second Circuit.
October 4, 2000.
*838 William D. Brown, III, Monroe, Walter M. Caldwell, IV, West Monroe, Gregory G. Elias, Monroe, Counsel for Appellants.
Crawford & Anzelmo by Brian E. Crawford and K. Douglas Wheeler, Monroe, Counsel for Appellees.
Before NORRIS, C.J., and GASKINS and PEATROSS, JJ.
NORRIS, Chief Judge.
A trust, formerly a member of a partnership, contested its expulsion from the partnership and sought alternative relief. At the close of evidence in a jury trial, the District Court sustained four motions for directed verdict and rendered judgment dismissing the trust's case. The trust now appeals. For the reasons expressed, we affirm in part, reverse in part and remand.

Factual background
The defendant, Salt Lake Farm Partnership, was a hunting club. According to testimony, the club was formed as a corporation in the late 1970s when one of the individual defendants, Travis Oliver, purchased a 3,200-acre tract of land in Caldwell and Richland Parishes. He assembled 10 other men, all avid hunters, to acquire this land and develop it for hunting. Each of the original members, including defendant Benjamin Peters and the plaintiff's brother, Ralph Brockman, put up $20,000; the club financed the balance of the $1.8 million purchase price. Sometime prior to 1982 Ralph transferred his share to trusts (hereinafter, "the Brockman Trust") on behalf of his two sons and named his brother, William Brockman, trustee.
*839 In 1982 the corporation dissolved and reformed as a partnership (hereinafter, "Salt Lake"). The Brockman Trust was an original partner, although Ralph Brockman retained hunting privileges, attended all partnership meetings and cast votes on behalf of the trust. Oliver and Peters were also partners; Oliver later converted his interest to a trust, but continued to serve as a managing partner. In addition to paying annual hunting dues, each partner was liable to make an annual capital contribution ("capital call") of up to $20,000; however, upon unanimous vote of all partners, a capital call of more than $20,000 could be required. The Articles of Partnership further provided that if any partner failed to pay a capital call, "the Partnership shall liquidate that Partner's interest." Upon liquidation a partner was entitled to receive 70% of his capital account, with the balance being forfeited to the partnership.
Salt Lake refinanced its debt in 1986 with a five-year loan from Premier Bank; Ralph Brockman made the motion in favor of this loan and voted for it. Ralph admitted that until early 1990, he attended all partnership meetings, cast votes for the Brockman Trust and signed the meeting minutes, which were normally mailed to members within a few days of each meeting. Ralph testified, however, that the trustee, William, actually signed documents on the trust's behalf. It is undisputed that neither the partnership, any partner, nor William Brockman ever challenged Ralph's authority to act on behalf of the trust at meetings.
In addition to hunting, much of Salt Lake's business in the 1980s involved building a levee along the south and east boundaries to flood the property. At some point, Oliver purchased 80 acres of land ("the Oliver tract") to the north of the Salt Lake tract. This provided the most convenient access from the road to the Salt Lake tract; some four or five acres of the Oliver tract were cleared to build a boat landing and a ditch. Oliver testified that he and another partner, Joe Montgomery, paid for these improvements; Ralph Brockman testified that the improvements were made with his construction equipment. Although Oliver did not grant a lease or right-of-way to the club, he testified that he always allowed members free use of the Oliver tract for ingress and egress. Witnesses described one incident in which Oliver ejected an unauthorized person from the Oliver tract; this turned out to be an employee of Ralph Brockman's. Ralph testified that incidents in other business dealings with Oliver were straining their relationship by the late 1980s. The testimony also shows that by 1991, some partners had withdrawn from Salt Lake, reducing the number of partners to seven.
For many years Salt Lake assessed capital calls of a few thousand dollars a year. By 1991, however, the Premier loan was due to expire and partners wished to refinance on an in rem basis, without personal liability. Salt Lake's treasurer, Ben Peters, an attorney and contractor who also served on Premier's state board, advised members that in order to obtain such financing, Salt Lake would have to increase its equity in the property. According to meeting minutes of May 20, 1991 with William Brockman in attendance Peters estimated that a $28,500 capital call would be needed. However, after receiving a bid from a lender, Peters advised members that a $60,000 capital call was necessary. The minutes reflect not only that William Brockman was present for this meeting, but that the partners voted unanimously to proceed with the loan proposal. Final vote on the matter was set for a meeting to be held September 30, 1991.
Prior to the vote, however, Ralph Brockman initiated phone calls and sent written memos to partners, expressing his dissatisfaction with the direction Salt Lake was taking. Ralph was concerned that club members might lose access to the Oliver tract, and thus access to the Salt *840 Lake tract; he testified that he demanded, orally and in writing, a permanent right of way across the Oliver tract as a precondition to voting for the refinancing. He testified that he took this position because Oliver told him a lease of the Oliver tract would be "prohibitively expensive." Oliver denied saying this, and testified along with Peters and another member, Hardeman Cordellthey understood the Brockmans were asking for "satisfactory" ingress and egress, not a permanent servitude. Ralph's written memo of July 11, 1991, specifically instructed William to request a "10 year lease for the property located at our boat landing." Ralph's letter to Peters on July 18 demanded that the club lease the whole 80 acres; if this proved too expensive, he would request "permanent ingress and egress for the entire gravel landing and the spoil bank."
Ralph testified that he was also dissatisfied with the $60,000 capital call, especially since more affluent partners (like himself) were required to guarantee payment for less affluent ones. He felt this would put a strain on some members. In fact, Ralph discussed with Peters in late July the possibility of selling his interest; a memo from Peters dated July 24 shows they estimated the Brockman Trust's capital account at $164,166. Ralph testified, however, that after talking with Travis Oliver, he felt sure the ingress/egress issue was resolved and he was prepared to vote for the capital call. Oliver testified that prior to the meeting, he agreed to grant a 10-year lease over the shell road and landing for vehicular and boat access; Peters and Cordell corroborated that Oliver promised to provide ingress and egress, and they all felt Ralph Brockman's demands had been satisfied.
Neither Ralph nor William Brockman was able to attend the September 30, 1991 meeting; William had scheduled dental surgery and Ralph had planned to be out of the country on a hunting trip. After receiving official notice of the meeting, Ralph gave a written proxy, dated September 26, to Hardeman Cordell:
Please accept this letter as a proxy to vote the William G. Brockman, Trustee share of Salt Lake Partnership at the upcoming meeting on Monday, September 30, 1991.

Yours truly, Ralph Brockman
Hardeman testified that when Ralph phoned to ask him to vote the proxy, he directed him only to "get some ingress and egress over that property." As noted, Oliver agreed to grant a 10-year lease, though this was not executed until October 29, 1991. According to the minutes, Hardeman cast the Brockman Trust's vote in favor of the capital call, which passed unanimously at the September 30 meeting. Each partner's $60,000 was due October 25.
William Brockman received formal notice of the capital call by certified mail on October 3, 1991; Ralph received notice on October 10, when he returned from his hunting trip. Ralph also testified that in accordance with the September 30 vote, he was asked to indorse the note of another partner, Dickie Culpepper, for the capital call; however, Culpepper decided the cost was too high and withdrew from the partnership. Nevertheless, because he did not see anything in writing about the right-of-way, on October 28 Ralph sent the treasurer of Salt Lake a check for $20,000, the maximum capital call allowed by the articles of partnership without a unanimous vote. Ralph further testified that when he received a copy of the 10-year lease on October 29, he decided it did not meet his demand for permanent right-of-way across the Oliver tract.
According to testimony, Salt Lake tried to negotiate with the Brockmans during October and November 1991. Ralph testified that he offered to pay no more than $30,000 on the capital call, and that on November 21, Salt Lake offered him $78,000-$80,000 for his capital account. The minutes show that Salt Lake terminated *841 the Brockman Trust's interest on December 11, 1991.
After suit was filed, Salt Lake issued two checks totaling $49,953.61 to the Brockman Trust in payment for 70% of its capital account. Salt Lake also refunded the trust $14,000 of the capital call it had tendered.

Procedural history
William Brockman, as trustee, filed the instant suit in January 1992. Alleging that Salt Lake's actions were wrongful, the trust sought to recover 70% of its capital account and other expenses. Alternatively, on the theory that the termination was invalid, the trust demanded a declaratory judgment to that effect and dissolution of the partnership. Further in the alternative, it sought declaratory judgments on 11 enumerated factual contentions. In addition to Salt Lake, the petition named Oliver, Peters and Cordell as defendants on grounds that they breached fiduciary duties to the Brockman Trust. Several incidental demands were filed; a reconventional claim based on defamation was severed and held in abeyance pending the outcome of the principal action. The trust dismissed Cordell with prejudice, reserving rights against all other defendants; another individual defendant, Oliver, was dismissed by discharge in bankruptcy.
The matter proceeded to jury trial in June 1999. Principally through the testimony of Ralph and William Brockman, the Brockman Trust made the following major factual assertions:
1. The $60,000 capital call was invalid because it required the unanimous consent of all partners. However, the Brockman Trust's consent was not valid because the proxy had been granted by Ralph Brockman, who was not the trustee.
2. The trust's consent was also invalid because the Brockman Trust's vote was specifically conditioned on acquiring a permanent right-of-way across the Oliver Tract. However, only a 10-year lease of the shell road and boat access was obtained, so the condition was never fulfilled.
3. After the September 30, 1991 meeting, the secretary of Salt Lake did not promptly mail meeting minutes to the Brockman Trust, thus keeping it in the dark and denying it the ability to act more quickly to protect its interest. The secretary also sent no further notices of subsequent meetings. The Brockmans viewed these acts as a breach of fiduciary duty.
4. Salt Lake undervalued the Brockman Trust's capital account: as of July 1991, Peters estimated it was worth $164,166; in November, Salt Lake offered the trust $78,000; and the ultimate reimbursement was only $49,953. The trust claimed it was still due some reimbursement.
After both sides presented all their evidence, the defendants filed several motions for directed verdict. The District Court granted each of these, effectively rejecting all the plaintiff's claims. Judgment was rendered dismissing all claims, and the Brockman Trust now appeals, advancing seven assignments of error.

Discussion: Directed verdicts
By its first four assignments of error the Brockman Trust urges the District Court committed manifest error in granting the defendants' motions for directed verdict and dismissing all the trust's claims. In support, the trust cites the court's comment, before granting the motion with respect to the conditional proxy, that "the jury could ponder that question"; this, the trust argues, shows that the evidence and inferences did not point overwhelmingly in favor of granting the motion. The trust further argues that there was conflicting testimony regarding several of the issues posed by the motions, and evaluations of credibility cannot be utilized in deciding the motion for directed verdict. The trust concludes that the case should have been submitted to the jury, and prays for either *842 a new trial or a judgment in favor of the plaintiff.
The motion for a directed verdict is a procedural device available in jury trials to promote judicial efficiency. The motion is appropriately made at the close of the evidence offered by the opposing party and should be granted when, after considering all evidentiary inferences in the light most favorable to the movant's opponent, it is clear that the facts and inferences so overwhelmingly favor a verdict for the movant, that reasonable jurors could not have arrived at a contrary conclusion. La. C.C.P. art. 1810; Collins v. Whitaker, 29,324 (La.App. 2 Cir. 4/2/97), 691 So.2d 820, and citations therein. If there is substantial evidence opposed to the motion, i.e., evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied and the case submitted to the jury. King of Hearts Inc. v. Wal-Mart Stores Inc., 27,137 (La. App. 2 Cir. 8/23/95), 660 So.2d 524, and citations therein. While credibility evaluations should not enter the process, the trial court has much discretion in deciding whether to grant or deny the motion. Walker v. Louisiana Health Management Co., 94 1396 (La.App. 1 Cir. 12/15/96), 666 So.2d 415, writ denied 96-0571 (La.4/19/96), 671 So.2d 922.
The standard of review of a trial judge's grant of a directed verdict is whether, viewing the evidence submitted, reasonable men could not reach a contrary verdict. Steed v. St. Paul's United Methodist Church, 31,521 (La.App. 2 Cir. 2/24/99), 728 So.2d 931, writ denied 99-0877 (La.5/7/99), 740 So.2d 1290. Moreover, the appellate court must evaluate the propriety of a directed verdict in light of the substantive law related to the claims. Steed v. St. Paul's United Methodist Church, supra. We have therefore reviewed the evidence as to each of the claims in light of the substantive law.

Validity of the proxy
The trust's first assignment of error urges the proxy given to Hardeman Cordell was invalid because it was issued by Ralph Brockman, the settlor of the trust, instead of by William Brockman, the trustee. The trust concedes that Ralph had a long history of appearing at meetings and casting votes on behalf of the trust, but contends that William always executed legal documents such as deeds and mortgages. The trust urges that Salt Lake cannot rely on the theory of apparent authority because the partnership "blindly" accepted Ralph's authority. The trust finally contends that even if Ralph was authorized to grant the proxy, the "yea" vote on the capital call was specifically conditioned on obtaining permanent right-of-way over the Oliver tract; since no such right-of-way was secured, the proxy was invalid.
A trustee is a person to whom title to the trust property is transferred to be administered by him as a fiduciary. La. R.S. 9:1781; Restatement (2d) of Trusts, § 169 (1959). The trustee's power of administration includes incurring expenses which may be necessary to carry out the purposes of the trust. La. R.S. 9:2117; Restatement (2d) of Trusts, § 188 (1959). However, a trustee may delegate to a mandatary the power to perform ministerial acts and acts that he could not reasonably be required to perform personally. La. R.S. 9:2116; Restatement (2d) of Trusts, § 171 (comment d, 1959).
Apparent authority is a doctrine by which an agent is empowered to bind his principal in a transaction with a third party when the principal has made a manifestation to the third party, or to the community of which the third party is a member, that the agent is authorized to engage in the particular transaction, although the principal has not actually delegated this authority to the agent. Tedesco v. Gentry Development Inc., 540 So.2d 960 (La.1989), and citations therein. Courts utilize the doctrine of apparent authority *843 to protect third persons by treating a principal who has manifested an agent's authority to third parties as if the principal had actually granted the authority to an agent. Id. When the apparent scope of the agent's authority, the indicia of authority, is relied upon by innocent third parties to their detriment, the principal is liable. Independent Fire Ins. Co. v. Able Moving & Storage Co., 94-1982 (La.2/20/95), 650 So.2d 750; Restatement (2d) of Agency, § 8 (1958).
We have closely examined the record evidence. Ralph and William both testified that they discussed the capital call extensively before the September 30, 1991 meeting. Both acknowledged that refinancing was a matter of great importance to Salt Lake. However, William could not attend that meeting because of previously scheduled oral surgery. The use of proxies was common at Salt Lake meetings; Ralph phoned Hardeman Cordell and asked him to serve as proxy; he gave Cordell a written proxy as well as a letter outlining "some of my thoughts on the upcoming Salt Lake meeting." Over the years, Ralph had most often spoken and voted for the Brockman Trust at Salt Lake's meetings. Notably, there is no evidence (such as the instrument of trust) to show that a delegation of authority would be ultra vires. In short, reasonable jurors would inevitably conclude that William delegated voting authority to Ralph in accord with R.S. 9:2117, and Ralph therefore had the apparent authority either to cast this vote himself or grant a proxy to Cordell.
Moreover, Ralph testified that he "called the shots" for the Brockman Trust; in a deposition, he added that other partners "perceived" that he called the shots. R.p. 755. This was corroborated by every other witness. Any rational juror would inevitably conclude that by a long course of conduct, the Brockman Trust manifested to Salt Lake and to all the partners, that Ralph Brockman held the authority to bind the trust. Salt Lake was reasonable in accepting this because until September 1991 the trust always performed in accordance with Ralph's statements and votes. Simply put, under both the Trust Code's provision for delegation, R.S. 9:2116, and the jurisprudential concept of apparent authority, Tedesco v. Gentry Development Inc., supra, the trial court was not in error to grant a directed verdict on the validity of Ralph Brockman's proxy.
Finally, the trust urges the proxy was invalid because it was conditioned on a premise, a permanent right-of-way across the Oliver tract, that did not occur. Ralph Brockman testified that this was always a condition of his vote for the capital call; his wife testified that she overheard him explicitly instructing Cordell to this effect. The documentary evidence, however, shows that prior to the September 30, 1991 meeting, Ralph mentioned a permanent right-of-way only once, and then as an alternative to a lease; and all other witnesses agreed that Ralph said he wanted "satisfactory" ingress and egress, which was provided by the 10-year lease over the shell road. The trust argues that because of the divergent testimony, the trial court erred in granting a directed verdict. Walker v. Louisiana Health Management Co., supra.
The issue, however, is not one of credibility, but of materiality. Neither Ralph's written proxy nor his follow-up letter to Hardeman Cordell mentions any condition; if one existed, then the trust's remedy would be against Cordell for voting contrary to the trust's instructions. The trust, however, dismissed Cordell from the suit in June 1992. In short, this disputed testimony is immaterial to the validity of the proxy.

Breach of fiduciary duty
By its second and fourth assignments the trust urges that the District Court erred in granting a directed verdict dismissing its claims of breach of fiduciary duty against Salt Lake and Ben Peters individually. The trust argues that partners owe each other a general fiduciary *844 duty of good faith and fair dealings with one another with respect to partnership affairs, and specifically a duty of disclosure. See, e.g., W.A. McMichael Const. Co. v. D & W Properties Inc., 356 So.2d 1115 (La.App. 2 Cir.), writ denied 359 So.2d 198 (La.1978). The trust urges that Peters and Salt Lake breached the duty of disclosure by failing to send minutes of the September 30, 1991 meeting to the trustee within a reasonable period of time, thus keeping the trust in the dark about the affairs of the partnership and impairing the trust's ability to protect its interest. The trust also argues that Peters failed to inform the partners about the details of the refinance and the conditions of the capital call, and accepted a proxy that was "on its face, invalid and without authority." These acts, the trust contends, amounted to a breach of fiduciary duty.
A partner owes a fiduciary duty to the partnership and to his partners; he may not conduct any activity, for himself or on behalf of a third person, that is contrary to his fiduciary duty and is prejudicial to the partnership. La. C.C. art. 2809. Each partner must refrain from taking any advantage of another partner by the slightest misrepresentation or concealment of material facts. W.A. McMichael Const. Co. v. D & W Properties, supra. The elements of a cause of action for a breach of fiduciary duty, or a knowing participation in such, are: (1) a breach by a fiduciary of an obligation to another; (2) a knowing collusion or participation in the breach by the fiduciary; and (3) damages suffered by another as a result of the breach. Oliver v. Central Bank, 26,932 (La.App. 2 Cir. 5/10/95), 658 So.2d 1316. Further, the cause of action requires proof of fraud, breach of trust or action outside the limits of the fiduciary's authority; the burden of proof is on the plaintiff. Id.
Notably, this case does not involve self-dealing by Peters or any effort to purchase the interest of another partner, thus distinguishing the case from W.A. McMichael Const. Co. v. D & W Properties Inc., supra.
The testimony establishes that the secretary of Salt Lake normally prepared meeting minutes and circulated them to partners within a week or so after each meeting; partners signed the minutes. All witnesses admitted that after the September 30, 1991 meeting, the secretary at the time, Ben Peters, did not mail the minutes to the Brockman Trust until mid-November, over six weeks later. However, it is undisputed that prior to that meeting, the Brockman Trust (as well as all other partners) were aware that the matters of refinancing and a large $60,000 capital call would be on the agenda. Knowing the importance of this vote, Ralph Brockman gave a proxy. The record also shows that on October 3, some four days after the meeting, the trust received a notice of the $60,000 capital call. In late October, after the capital call was due, correspondence from William and Ralph Brockman indicated they were aware of the capital call, but disputed its legality. This evidence overwhelmingly preponderates to show that the trust was aware of the capital call by early October, no later than if Peters had promptly mailed meeting minutes.
As for the claim that Peters and Salt Lake failed to give the trust adequate information about the terms of the refinance, a cursory reading of the meeting notices, waivers and minutes for July 15 and August 23, 1991, completely belie this assertion. Finally, for the reasons already discussed, Salt Lake was entitled to accept and use the proxy granted on the trust's behalf by Ralph Brockman. Reasonable jurors could not have concluded that the defendants breached any fiduciary duties to the trust. These assignments lack merit.

Intentional misconduct
By its third assignment the trust urges that the District Court erred in granting a directed verdict dismissing its claims of intentional misconduct. The trust contends *845 that Ben Peters and Salt Lake accepted a patently invalid proxy in order to obtain a unanimous vote for the capital call on September 30, 1991, and then withheld critical information from other partners, all "in conformity with a purge that had been desired by managing partner, Travis Oliver," who wished to rid the partnership of "poor members."
For the reasons already discussed, Salt Lake was entitled to accept the proxy granted by Ralph Brockman on the trust's behalf, and all partners were given sufficient notice of the capital call. The trust's contentions to the contrary are unsubstantiated and do not prove intentional misconduct.
The evidence shows that the $60,000 was too high for one of the partners, Dickie Culpepper, who decided to withdraw as a partner (but remained a dues-paying hunting member). It also led Salt Lake to terminate the Brockman Trust's interest. However, neither Culpepper nor Ralph Brockman contested the need for the capital call in light of the requirements for refinancing. Also, the trust does not contest that the Articles of Partnership, ¶ 16.2, require termination for any partner who fails to make a capital call. Reasonable jurors must inevitably find that Salt Lake and Peters did not engage in intentional misconduct designed to purge out "poorer members." This assignment lacks merit.
Moreover, even if disputed testimony somehow made the directed verdicts improper, we would find on de novo review that the trust failed to carry its burden on these issues. See, Adams v. Travelers Ins. Co., 589 So.2d 605, 609 (La.App. 2 Cir. 1991). The evidence is overwhelming that Ralph had the authority to grant a voting proxy, that Cordell voted it in accord with Ralph's request, and that neither Salt Lake nor Peters breached any fiduciary duties or engaged in intentional conduct designed to squeeze the Brockman Trust out of the partnership. This portion of the judgment is affirmed.

Joint stipulations
By its fifth assignment of error, the Brockman Trust contests the District Court's ruling with respect to Exhibits J-1 through J-23.[1] At the beginning of trial, the parties filed "Joint stipulations to exhibits," which stated:
Many of the exhibits that will be offered in this matter are the same for both parties. As such, all parties stipulate to the introduction of the following exhibits without objections into evidence in this matter.
This document, signed by counsel for the Brockman Trust, listed 37 items originally designated as Brockman exhibits. At the beginning of trial, counsel for Salt Lake stated that he would "make these joint offerings because they're essentially communication between the parties."
On direct examination, counsel for the trust asked Ralph Brockman to discuss Exhibit J-16, his July 11, 1991 memo to William Brockman, and J-17, his July 18, 1991 letter to Ben Peters. Counsel asked Ralph to describe his "reason behind drafting the memo" and his "concerns with respect to advancing the $60,000." Salt Lake objected, urging that each document was self-explanatory. The court sustained the objection, allowing Ralph only to read the items into the record.
The following day, counsel for the trust re-urged its position that the joint stipulation was for authentication only, not correctness, and that the witness should be able to go beyond the four corners of the documents. The court still sustained Salt Lake's objection; the trust then moved withdraw the stipulation, and this was denied.
Stipulations have the effect of judicial confessions. R.J. D'Hemecourt Petroleum v. McNamara, 444 So.2d 600 (La. 1983), cert. denied 469 U.S. 820, 105 S.Ct. *846 92, 83 L.Ed.2d 39 (1984). A judicial confession is indivisible and may be revoked only on the ground of error of fact. La. C.C. art. 1853; Mollere v. Creole Engineering Sales Co., 570 So.2d 212 (La.App. 5 Cir.1990). The Brockman Trust has neither alleged nor shown any error of fact in entering the stipulation; thus the court was not wrong to deny the motion to withdraw it. In view of the stipulation, the court had the discretion to disallow evidence that contradicted the text of the documents. 2304 Manhattan Blvd. Partnership v. Louisiana Power & Light Co., 94-192 (La.App. 5 Cir. 9/14/94), 643 So.2d 1282.
We also note in spite of the court's ruling, both Ralph and William testified extensively as to their thoughts and impressions during July 1991. There is no substance to the claim that the trust was denied the right to put on this evidence. This assignment of error lacks merit.

Testimony of expert CPA
By its sixth assignment the trust urges the District Court committed manifest error in refusing to allow its expert witness, Bruce Betts, CPA, to testify. Ralph Brockman testified that in July 1991, Ben Peters said the Brockman Trust's share of the partnership was worth $164,166; Peters's handwritten note, dated July 24, 1991, confirms this. Ex. J-8. Later, Salt Lake offered the trust $78,000 for its share. Ultimately, Salt Lake's CPA, Ernest Allen, calculated the trust's share to be worth $69,764; on this basis, Salt Lake reimbursed the trust $49,953. The trust called Mr. Allen to testify; he never explained how the $69,764 capital share was figured. The trust then called Mr. Betts. Salt Lake objected, urging that Mr. Betts would cover the same ground as Mr. Allen. The trust argued that it had never been adequately reimbursed for its capital share. The court sustained Salt Lake's objection, ruling that Mr. Betts's testimony would be repetitive.
We are constrained to find that this ruling was in error. The trust's petition, though not a model of drafting clarity, ends with a prayer for declaratory judgment "confirming its ownership interest in the assets of the Partnership." Even though the trust failed to prove fiduciary breaches, intentional misdeeds, and the right to be reinstated into Salt Lake, it showed that upon termination it was owed 70% of its capital account. Articles, ¶ 16.4. The trust introduced sufficient evidence to cast doubt on Mr. Allen's final calculation. On these facts, the trust was entitled to call its own expert to prove the true value of its capital share in accordance with the Articles of Partnership, ¶ 7.1.[2] The District Court was legally wrong to dismiss all claims of the trust. The judgment will be reversed and the case remanded for a new trial limited to proof of the value of the Brockman Trust's capital share.

Conclusion
By its final assignment the trust contests being condemned to pay all court costs. Ordinarily, costs shall be paid by the party cast in judgment. La. C.C.P. art. 1920. The appellate court may tax the costs of the lower or appellate court, or any part thereof, against any party to the suit, as in its judgment may be considered equitable. La. C.C.P. art. 2164. Under the circumstances, we reverse the award of costs and direct the District Court, upon remand, to assess costs in accord with the final judgment.
For the reasons expressed, the judgment is AFFIRMED with respect to paragraphs I, II, III, IV and VI. However, the *847 judgment is REVERSED with respect to paragraph V. The case is remanded for further proceedings in accord with this opinion. Appellate costs are assessed one half to William Brockman, trustee of the Brockman Trust, and one half to Salt Lake Farm Partnership.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
NOTES
[1] In the text of its brief, the trust also mentions Exhibit J-37.
[2] "The Partner's capital account shall consist of (a) his original capital contribution (b) increased by his additional contributions to capital (c) increased by his share of ordinary income or decreased by his share of ordinary loss, (d) increased by his share of income not included in (c) plus nontaxable income, (e) decreased by his share of losses not included in (c) and by his share of unallowable deductions, and (f) decreased by his share of withdrawals and distributions."