748 So.2d 1263 (1999)
Elder D. Faye CLIFTON, Plaintiff-Appellee/Second Appellant,
v.
Edward O. COLEMAN, et al, Defendant-First Appellant/Appellee.
No. 32,612-CA.
Court of Appeal of Louisiana, Second Circuit.
December 23, 1999.
*1265 Gary D. Nunn, Jonesboro, for Elder D. Faye Clifton.
Theus, Grisham, Davis & Leigh, by Charles H. Heck, Phillip D. Myers, Monroe, for USAA Property & Casualty Insurance Co. and Edward O. Coleman.
Hayes, Harkey, Smith & Cascio, by Joseph D. Cascio, Jr., Monroe, for Ouachita Parish Policy Jury.
Monique Freeman Rauls, Baton Rouge, Ashley Bristow Witherspoon, Alexandria, Victoria Reed Murry, Baton Rouge, for State of Louisiana, DOTD, Department of Justice.
Tracy L. Oakley, Ruston, for June S. Thompson and Illinois National Insurance Co.
BEFORE: STEWART, GASKINS and CARAWAY, JJ.
CARAWAY, J.
The two motorists in this case, the plaintiff and the defendant/third-party plaintiff, appeal a decision of the trial court that dismissed their claims against the State of Louisiana through the Department of Transportation and Development ("DOTD") and the Parish of Ouachita (the "Parish") at the close of plaintiff's caseinchief. For the following reasons, we affirm the trial court with respect to the dismissal of DOTD, but reverse and remand for a new trial with respect to the Parish.

Facts
On June 27, 1995, an automobile accident occurred at the intersection of Louisiana Highway 546 and Cheniere Cutoff Road (hereinafter the "Cutoff") in Ouachita Parish, Louisiana. The plaintiff, Elder "Faye" Clifton ("Clifton"), was a passenger in the vehicle of June Thompson ("Thompson"). The two women were traveling north on Highway 546, and as Thompson's vehicle reached the intersection of the Cutoff, Dr. Edward 0. Coleman ("Coleman") pulled out in front of the Thompson vehicle. Coleman was traveling west on the Cutoff in the wrong direction at the time he intersected Highway 546. The Cutoff is a one-way road that is designated for travel in an easterly direction.
Clifton filed suit against Coleman and his automobile insurer, USAA Property and Casualty Insurance Company ("USAA"). Coleman and USAA then filed a third party demand against DOTD and the Parish seeking indemnification and/or contribution. Thereafter, Clifton amended her complaint to add these parties as defendants in the main demand.[1]
The complaint against DOTD and the Parish rests primarily on the theory that the parties did not place proper signs on Cheniere Station Road, Cheniere Extension Road (hereinafter the "Extension"), the Cutoff, and the intersection of the Cutoff and Highway 546. The Extension and the Cutoff together form the one-way easterly link between Cheniere Station Road and Highway 546 and are Parish maintained roadways for which the Parish is responsible for signage. At the intersection of Highway 546, a state highway, and the Cutoff, the DOTD is responsible for signage.
At the time he left Cheniere Station Road and entered the Extension, Coleman claims that there were no signs visible to him to indicate that he was entering a one-way road. Additionally, when he reached the Cutoff, Coleman claims that there *1266 were no signs to indicate that it was a one-way road going east. Furthermore, Coleman points out that while traveling the wrong way on the Cutoff heading toward Highway 546, he could see a stop sign at the intersection of the Cutoff and Highway 546. He claims that the stop sign led him to believe that he was traveling in the proper direction.
Because of these deficiencies, Clifton and Coleman charged that DOTD and the Parish were negligent for not properly "signing and maintaining" the roads and the intersection. Furthermore, Clifton and Coleman contend that a motorist stopped at the stop sign at the intersection of the Cutoff and Highway 546 cannot see oncoming northbound traffic on Highway 546 due to the embankment under a railroad trestle which obstructs the view of Highway 546. The Cutoff runs parallel to the railroad tracks, and at the intersection, the distance between the road and the embankment and trestle is approximately 20 feet.
A bifurcated trial was held with the trial court deciding all issues relating to the Parish and a jury hearing the claims of the remaining parties. At the close of Clifton's case-in-chief, the trial court granted DOTD's motion for directed verdict, dismissing DOTD. Also, the trial court granted the Parish's motion for involuntary dismissal, dismissing the Parish as a defendant and third party defendant.
The trial continued with Coleman and USAA as the remaining defendants. The jury returned a verdict in favor of Clifton, finding Coleman 100% at fault. The jury awarded damages in the amount of $168,800.00. Both Clifton and Coleman (hereinafter sometimes collectively referred to as "Appellants") have appealed complaining of the trial court's decision to dismiss DOTD and the Parish from the suit. Both Appellants request a remand for a new trial.

Discussion

Involuntary DismissalOuachita Parish
Appellants argue that the trial court committed manifest error when it granted the Parish's motion for involuntary dismissal. La.C.C.P. art. 1672(B) provides that in an action tried by the court without a jury, after the plaintiff has completed the presentation of her evidence, any party may move for a dismissal on the grounds that upon the facts and law, the plaintiff has failed to show a right to relief. In a non-jury case, the appropriate standard for the trial court's determination of a motion to dismiss is whether the plaintiff has presented sufficient evidence to establish her claim by a preponderance of the evidence. Vig v. City of Shreveport, 28,530 (La.App.2d Cir. 8/21/96), 679 So.2d 524, writ denied 96-2285 (La.11/15/96), 682 So.2d 775; Darton v. Kroger Co., 30,711 (La.App.2d Cir. 8/25/98), 716 So.2d 974. A dismissal based on Article 1672(B) should not be reversed in the absence of manifest error or unless clearly wrong. Darton, supra. On the other hand, while factual determinations by the trier of fact are given great deference on appeal, if the trial court's decision was based on an erroneous application of law, rather than a valid exercise of discretion, the trial court's decision is not entitled to the deference it would otherwise enjoy. Lasha v. Olin Corp., 625 So.2d 1002 (La.1993); We Sell Used Cars, Inc. v. United Nat'l Ins. Co., 30,671 (La.App.2d Cir. 6/24/98), 715 So.2d 656.
In the instant case, the trial court concluded that Clifton, by her case-in-chief, failed to prove negligence against the Parish by a preponderance of the evidence. According to the trial court, its conclusion was based on Lee v. State of Louisiana Through the Department of Transportation and Development, 97-0350 (La.10/21/97), 701 So.2d 676, and its impression that the cause-in-fact of the accident was Coleman's failure to obey Louisiana's stop sign law. In Lee, which involved a claim against DOTD for improper signing of a highway, the supreme *1267 court stated that under La.R.S. 9:2800 the plaintiff must establish that the roadway was defective because it had a condition which created an unreasonable risk of harm, that the owner or custodian of the road had actual or constructive notice of the defect and failed to take corrective measures within a reasonable time, and that the defect was a cause-in-fact of plaintiff's injuries. Id. at 678. The court further added that the governmental authority that undertakes to control traffic at an intersection must exercise a high degree of care for the safety of the motoring public. Yet, it cannot be held responsible for all injuries resulting from any risk posed by the roadway or its appurtenances, only those caused by an unreasonable risk of harm to others. Id.
In the plaintiff's case-in-chief, Coleman was shown to have left Cheniere Station Road (a two lane road on which he was heading south) intending to cut across westerly to Highway 546 via the Extension and the Cutoff. At Highway 546, he was intending to turn back north when the accident occurred. Coleman testified that he was unfamiliar with these rural roads at the time of the accident.
Prior to dismissal of the Parish, Clifton's witnesses, including Coleman, testified and established the following facts:
A. There were no "one-way" or "do not enter" signs near the Cutoff to indicate that the road was a one way road for east bound traffic only;
B. The state trooper investigating the accident traveled the same route Coleman did, and he did not notice any such warning signs near the Extension or the Cutoff;
C. The state trooper also testified that at the intersection of the Cutoff and Highway 546, when looking left for northbound traffic, all he could see was the railroad embankment;
D. The state trooper did not give Coleman a ticket for driving the wrong way on a one-way street, because he did not see any one-way signs that would have warned Coleman;
E. The state trooper testified that the first time he saw a one-way sign was when he was at the stop sign facing the intersection of the Cutoff and Highway 524 (facing west on the eastbound road);
F. The signs in this area were repeatedly stolen or broken by vandals;
G. The Parish's traffic control supervisor testified that several traffic signs should have been present on Cheniere Station Road, the Extension and the Cutoff on the day of the accident; and
H. The Parish received complaints that traffic was traveling the wrong direction near the intersection of the Cutoff and Highway 546.
Additionally, the photographs of the intersection and the railroad trestle clearly reveal that an extreme sight obstruction existed at the accident site. The narrowness of the Cutoff as it intersects Highway 546 indicates that Coleman was required to make an abrupt ninety-degree turn with his vision blocked by the wall effect of the rock and soil embankment under the railroad. The soil embankment extends to the very edge of Highway 546 as the road passes under the trestle, a few feet before the intersection. The intended traffic configuration requiring the Cutoff to be a one-way road to the east is an obvious recognition of the unreasonably dangerous sight obstruction posed by the intersection for any driver, like Coleman, traveling to the west. Therefore, we rule that on the evidence presented, the sight obstruction caused by the railroad embankment and trestle amounted to an unreasonable risk of harm which required, at a minimum, the designation and signing of the Cutoff as a one-way road to the east. Holt v. State, Through Department of Transportation, 28,183 (La.App.2d Cir. 4/3/96), 671 So.2d 1164. This important initial ruling coincides with the trial court's ruling that this intersection is "only a dangerous intersection when it's used improperly. *1268 That is to say when motorists take the cutoff road westbound." The ruling is also consistent with the implied concessions of both the Parish and DOTD which stake their respective defenses on the one-way designation of the road and on Coleman's admitted recognition of the danger upon his stopping at the intersection immediately prior to the accident.
With the existence of an unreasonable risk of harm at the intersection, Clifton attempted to show that the Parish's corrective measuresthe signing of the Extension and the Cutoff as one-waywere defective, and that the Parish was on notice of the continued vandalism of the signs and the local misuse of the roads as a westerly route. While this issue may yet be contested by the Parish, which has presented no defense because of its early dismissal, the record indicates to us that Clifton's case-in-chief established, more probable than not, that the Parish's response to the signing problems on these roads was untimely and inadequate. The testimony of the state trooper clearly established that the signage for the roads as one-way to the east was not present. Due to the configuration of the Extension and the Cutoff, signs at multiple locations along the route should have been posted to indicate both the one-way direction and the wrong-way prohibition to any unfamiliar driver such as Coleman. The contention by the Parish's traffic control supervisor that the roads were routinely inspected each week was not supported by the parish work order records. The parish work orders did not show the replacement for the missing signs until two months after the accident. With multiple signs securely in place along the entire length of the route, it is highly improbable that all such signs could go missing at one time so as to pose the risk encountered by Coleman.
Again, it is significant to us that the trial court did not base its ruling on the reasonableness of the Parish's monitoring of the signs along the Extension and the Cutoff, and in fact indicated that the Parish's duty with regard to signing was neglected. Instead, the trial court's ruling was based upon Coleman's reaction to the precarious situation he found himself in when he reached the dangerous intersection. In his testimony, Coleman candidly admitted the following:
Q. Dr. Coleman, when you were at this intersection you knew you couldn't see could you? I mean you knew that you couldn't see in the intersection traffic coming from the south?
A. I thought I had encountered a very difficult intersection where it was going to be difficult to see to the left which would be to the south.
Q. Sitting at that stop sign were you consciously aware that you could not see what was coming from the south headed in a northbound direction of 546?
A. I knew that it would appear to be very difficult to see that direction.
Q. Were you consciously aware that you couldn't see anything coming from the south on 546?
A. That's correct. I was.
Q. And isn't it correct that you took a calculated risk that no one was coming when you pulled out into that intersection?
A. I would say that's accurate.
Dr. Coleman further testified that his decision to venture into the intersection was also hurried in part by a second vehicle approaching him from behind, also traveling the wrong way on the road.
With this evidence, the trial court dismissed the Parish saying:
"... once Dr. Coleman got on that road, had there been an accident before getting to that stop sign, we'd have a bit of a different case in my view. The essential cause of this accident in the Court's view was the failure on the part of Dr. Coleman to fully obey the Louisiana stop sign law which says you stop. You don't move until it's safe to do so. Now in the Court's view that's the cause and [sic] fact of the accident."
In making this appraisal, we think the trial court erred as a matter of law. As *1269 such, its decision is not entitled to the deference that it might otherwise enjoy. Lasha, supra; We Sell Used Cars, Inc., supra. In focusing solely on Coleman's actions at the intersection, the court lost sight of its earlier finding of an unreasonable risk of harm presented by the extreme sight obstruction at the intersection. The Parish's duty as the owner of the Cutoff was to guard against a motorist's encountering that unreasonably dangerous condition, even though that motorist's carelessness in testing the traffic blindly contributes to the accident. In Holt, supra, both the DOTD, as the party responsible for the obstructed intersection, and the driver, who was required to stop, shared responsibility for the accident.
In reviewing the doctrine of assumption of the risk under Louisiana's comparative fault regime, the supreme court addressed the argument that a defendant should not be negligent when the plaintiff voluntarily encounters the risk. Murray v. Ramada Inns, Inc., 521 So.2d 1123 (La.1988). The court stated:
If accepted, defendants' argument would inject the assumption of risk doctrine into duty/risk analysis "through the back door." By that, we mean that the argument attempts to define the defendant's initial duty in terms of the plainfiff's actual knowledge, and thereby seeks to achieve the same result which would be reached if assumption of risk were retained as a defense, i.e., a total bar to the plaintiff's recovery.
Id. at 1136.
The Parish's duty in relation to the unreasonable risk of harm posed by the intersection was to prevent motorists from being placed in the position Coleman found himself in. His carelessness was within the scope of the duty initially owed to him by the Parish. Accordingly, we reverse the trial court's dismissal of the Parish and remand for new trial.

Directed VerdictDOTD
Also, at the close of Clifton's case-in-chief, the trial court stated that it did not find that there was any negligence on the part of DOTD and dismissed DOTD with a directed verdict. A motion for directed verdict may be made at the close of the evidence offered by an opponent. La. C.C.P. art. 1810. A motion for directed verdict is appropriately granted when, after considering all the evidence in the light and with all reasonable inferences most favorable to the movant's opponent, it is clear that the facts and inferences point so overwhelmingly in favor of granting the verdict, that reasonable jurors could not arrive at a contrary verdict. Adams v. Travelers Insurance Company, 589 So.2d 605 (La.App. 2d Cir.1991). The trial judge is granted much discretion in determining whether to grant a directed verdict.
In opposition to the directed verdict, Coleman first contends that the trial court procedurally erred when it dismissed the DOTD before allowing Coleman to put on evidence in support of his third party demand. La.C.C.P. art. 1040 indicates that Coleman, in making his incidental demand against DOTD, is considered as a plaintiff for all procedural rules of the code, and both La.C.C.P. art. 1810 and the analogous provision for involuntary dismissal, La. C.C.P. art. 1672(B), indicate that a motion for the early dismissal of a claim by "an opponent" or plaintiff should be entertained at the close of that party's case. Nevertheless, while Coleman's procedural claim would appear to have merit, we may pretermit this procedural issue in view of the proffer of evidence made by Coleman,[2] the weakness in Clifton's evidence against DOTD, and our determination from that evidence that DOTD was not at fault in this accident.
*1270 As indicated above, the unreasonably dangerous condition of the intersection in question involves two roads, one owned by DOTD and the other by the Parish. As owner of Highway 546, DOTD first had the shared responsibility with the Parish of requiring that the Cutoff be designated a one-way to the east so as to prevent any access from the cutoff road on to the state highway and to alleviate the blind intersection altogether. DOTD met that duty.
Secondly, DOTD admits that it had the duty of signing the intersection. At the time of the accident, the evidence indicated that DOTD had in place two one-way signs at each corner of the intersection showing the Cutoff as a one-way road. Coleman, who denies seeing those clearly posted signs, was nevertheless already in his position of peril when those one-way signs would have become visible to him. DOTD's action with regard to those oneway signs therefore fulfilled its duty in signing the intersection and was not a cause-in-fact of the accident.
Appellants nevertheless argue that DOTD's placement of a stop sign at the intersection acted as a lure and assurance to Coleman, as he traveled westerly along the Cutoff in the wrong direction. The stop sign allegedly caused him to continue west to the intersection. We disagree. While the stop sign was obviously aimed at stopping only a driver traveling the wrong way like Coleman, it cannot be said that but for the stop sign Coleman would not have reached the intersection and had the accident. Because of the Parish's failure regarding the missing signs at the intersections of Cheniere Station Road, the Extension and the Cutoff, Coleman thought he was on a two-lane road throughout his journey along the Extension and Cutoff. He therefore would have surely reached the intersection without the DOTD's stop sign in place and may have then proceeded into the intersection without stopping, causing greater injury and damage. We therefore find that DOTD's stop sign was not a cause-in-fact of the accident from which liability may arise.
Finally, despite the contentions in the proffered testimony of Coleman's expert witness, we do not find that the DOTD had a duty to act to monitor and prevent the abuse of the Cutoff by the local public who traveled the road in the wrong direction. Even assuming such a duty, Coleman, traveling on the unmarked road for the first time, was not a member of the class of abusers. Regulation of travel along the Extension and the Cutoff was the primary responsibility of the Parish.
Accordingly, we affirm the trial court's grant of the directed verdict in favor of DOTD.

Conclusion
For the foregoing reasons, the decision of the trial court dismissing the State of Louisiana through the Department of Transportation and Development is affirmed, the decision of the trial court dismissing Ouachita Parish is hereby reversed and remanded for a new trial. Costs of this appeal are to be borne equally by Coleman and Ouachita Parish.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
NOTES
[1] Claims made against Thompson and her insurer were settled prior to trial.
[2] After the dismissal of the Parish and DOTD, a proffer by Coleman was made of expert testimony relating to the liability of the Parish and DOTD based upon the configuration and the signing of the roads. Even in the absence of cross-examination by the dismissed parties, we are not convinced by this evidence and the remainder of the record that DOTD was shown to be negligent.