954 So.2d 335 (2007)
Louis J. TANNER and Ottomese Tanner, Plaintiffs-Appellants
v.
John C. COOKSEY, M.D. & Ophthalmic Mutual Insurance Company, Defendants-Appellees.
No. 42,010-CA.
Court of Appeal of Louisiana, Second Circuit.
April 4, 2007.
*336 McGlynn, Glisson, & Koch by Benjamin P. Mouton, Baton Rouge, for Appellants.
Hudson, Potts & Bernstein, LLP by Gordon L. James, Monroe, for Appellees.
Before BROWN, GASKINS and LOLLEY, JJ.
GASKINS, J.
In this medical malpractice case, the plaintiffs, Louis Jackson Tanner and his wife, Ottomese Tanner, appeal from a jury *337 verdict in favor of the defendants, Dr. John C. Cooksey, and his insurer, Ophthalmic Mutual Insurance Company. For the following reasons, we affirm.

FACTS
Mr. Tanner began seeing Dr. Cooksey, an ophthalmologist, in 1992. Mr. Tanner was diagnosed with glaucoma and cataracts in both eyes. In October 1994, Dr. Cooksey removed the cataract from the left eye and performed a procedure to relieve the pressure in that eye related to glaucoma. Mr. Tanner tolerated the surgery well.
In February 1996, Dr. Cooksey began suggesting that Mr. Tanner have the cataract removed from the right eye. Mr. Tanner declined the surgery. Cataract surgery was suggested in subsequent office visits for the next four years. On November 20, 2000, Mr. Tanner went to Dr. Cooksey with pain in his left eye. The cataract in the right eye had worsened and had become brunescent (brown). Dr. Cooksey again recommended surgery and told Mr. Tanner that the cataract had progressed to the point that the usual type of surgery, phacoemulsification, was not possible. The cataract would have to be removed through a more difficult procedure called extracapsular cataract extraction (ECCE). Mr. Tanner agreed to the surgery.
Surgery was performed on December 14, 2000. During the course of the operation, the posterior capsule of the eye was ruptured, resulting in bleeding. According to Dr. Cooksey, these ruptures are a risk of ECCE surgery.
The next day, Dr. Cooksey was in Washington, D.C. because at that time, he was also a member of Congress. An optometrist in his office saw Mr. Tanner for his postoperative checkup. Mr. Tanner could only see light with the right eye. The optometrist noted blood between the lens and the front of the iris. The optometrist called Dr. Cooksey, who instructed that Mr. Tanner be given more time to see if the blood would clear and his vision would improve.
At an appointment with Dr. Cooksey several days later, Mr. Tanner could detect hand motion with the right eye. On December 27, 2000, when Mr. Tanner saw Dr. Cooksey, he could still see only hand motion with the right eye and the pressure in the eye was high. However, he reported that a few days earlier, he had been able to see cars on the road in front of his house. Dr. Cooksey could see a small blood clot in the eye. He chose not to refer Mr. Tanner to a retinal specialist at that point because he felt the patient's vision was continuing to improve.
Dr. Cooksey saw Mr. Tanner on January 2, January 8, and January 15, 2001. The vision in the right eye did not improve. On January 15, 2001, Dr. Cooksey felt that Mr. Tanner might have a choroidal detachment and referred him to Dr. Barron, a retinal specialist.
Dr. Barron dilated the eye and did a B-scan, a type of ultrasound, which showed that the retina in the right eye was detached. He performed surgery twice to reattach the retina. The retina was reattached, but vision was not restored to the eye.
The plaintiffs convened a medical review panel which determined that Dr. Cooksey breached the applicable standard of care by not referring Mr. Tanner to a specialist after the December 27, 2000, visit. The panel was not able to determine if the breach resulted in damage to Mr. Tanner.[1]
*338 The Tanners filed suit against Dr. Cooksey and his malpractice insurer for damages for loss of vision in the right eye and for loss of consortium. In addition to claiming that Dr. Cooksey breached the standard of care by failing to refer Mr. Tanner to a retinal specialist earlier, they also asserted that Dr. Cooksey breached the standard of care by recommending surgery on the right eye when Mr. Tanner was not complaining of loss of vision in that eye.
The defendants answered, asserting the affirmative defense of patient fault, arguing that Mr. Tanner's delay in having the surgery increased the risk and played a significant role in the ultimate outcome.
The matter was tried to a jury on March 7-10, 2006, with numerous medical experts testifying on behalf of both sides. Following the close of the defendants' case, the plaintiffs moved for involuntary dismissal of the defendants' affirmative defense of patient fault. The trial court denied the motion.
The jury found that the plaintiffs failed to prove that Dr. Cooksey's treatment and care of Mr. Tanner fell below the standard of care applicable to ophthalmologists, and that as a proximate result, Mr. Tanner suffered injuries which otherwise would not have occurred. The trial court signed a judgment in favor of the defendants, dismissing the plaintiffs' claims.
The plaintiffs appealed, arguing that the trial court erred in denying their motion for involuntary dismissal of the defendants' affirmative defense of patient fault. They also maintain that the jury was manifestly erroneous in concluding that Dr. Cooksey's treatment did not fall below the applicable standard of care for ophthalmologists. Alternatively, they contend that the jury erred in concluding that Dr. Cooksey's conduct did not cause the injuries suffered by Mr. Tanner.

MOTION FOR INVOLUNTARY DISMISSAL
The plaintiffs argue that the trial court erred in failing to grant their motion for involuntary dismissal after the close of the defendants' case. They contend that the defendants did not offer evidence to support the allegation that Mr. Tanner failed to act reasonably as a patient in declining to have surgery earlier or that his actions caused or contributed to the loss of vision in the right eye. Therefore, the plaintiffs urge that the defendants failed to prove their affirmative defense of patient fault. The plaintiffs urge that allowing the argument of comparative fault caused the jury to disregard Dr. Cooksey's substandard care and to conclude that Mr. Tanner was at fault.
*339 The motion for involuntary dismissal was not the proper procedural vehicle because this matter was not tried by a judge, but a jury.[2] The plaintiffs should have moved for a directed verdict under La. C.C.P. art. 1810. We will address the efficacy of this assigned error, however, by examining whether a directed verdict should have been granted. La. C.C.P. art. 1810 provides:
A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict that is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.
The motion for directed verdict is a procedural device available in jury trials to promote judicial efficiency. The motion is appropriately made at the close of the evidence offered by the opposing party and should be granted when, after considering all evidentiary inferences in the light most favorable to the movant's opponent, it is clear that the facts and inferences so overwhelmingly favor a verdict for the movant, that reasonable jurors could not have arrived at a contrary conclusion. See Clifton v. Coleman, 32,612 (La.App.2d Cir.12/23/99), 748 So.2d 1263, writ denied, XXXX-XXXX (La.3/24/00), 758 So.2d 151. If there is substantial evidence opposed to the motion, i.e., evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied and the case submitted to the jury. While credibility evaluations should not enter the process, the trial court has much discretion in deciding to grant or deny the motion. Brockman v. Salt Lake Farm Partnership, 33,938 (La.App.2d Cir.10/4/00), 768 So.2d 836, writ denied, XXXX-XXXX (La.12/15/00), 777 So.2d 1234; King of Hearts, Inc. v. Wal-Mart Stores, Inc., 27,137 (La.App.2d Cir.8/23/95), 660 So.2d 524.
On review, an appellate court also considers whether the evidence submitted indicates that reasonable triers of fact would be unable to reach a different verdict. The court of appeal considers the evidence under the substantive law applicable to the nonmoving party's claim. McNabb v. Louisiana Medical Mutual Insurance Company, XXXX-XXXX (La.App. 3d Cir.11/5/03), 858 So.2d 808, writs denied, XXXX-XXXX (La.2/13/04), 867 So.2d 701; XXXX-XXXX (La.2/13/04), 867 So.2d 702.
The record shows that the defendants offered evidence of patient fault in response to the plaintiffs' allegations that Dr. Cooksey committed malpractice in suggesting that Mr. Tanner have surgery on the right eye when he was satisfied with the vision in that eye. There was sufficient evidence on this issue for reasonable *340 and fair-minded jurors to reach different conclusions. Accordingly, a motion for a directed verdict would have been properly denied.
Based upon the record before us, we find that the trial court did not abuse its discretion in denying the motion, regardless of the moniker assigned to it. There was sufficient evidence as to the defendants' affirmative defense to allow the matter to be decided by the jury. Further, the jury verdict form shows that the jury did not reach the issue of comparative fault. Accordingly, the trial court's decision to deny the plaintiffs' motion is affirmed.[3]

BREACH OF STANDARD OF CARE
The plaintiffs next argue that the jury was manifestly erroneous in finding that Dr. Cooksey did not breach the standard of care when he failed to refer Mr. Tanner to a retinal specialist on December 27, 2000.[4] They cite Dr. Cooksey's testimony that a rupture of the posterior capsule, which occurred in this case, made retinal tears and detachments more likely. They point to the follow-up visit of December 20, 2000, when Dr. Cooksey did not dilate the eye and saw only a dim reflex in the back of the eye. They claim that there was no way to confirm that the retina had not detached at that time.
The jury's finding in a medical malpractice case is subject to manifest error review; it cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989); Ball v. Charter Forest Behavioral Health System, Inc., 41,329 (La.App.2d Cir.8/23/06), 938 So.2d 1092. In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirely and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. The appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently. Pinsonneault v. Merchants & Farmers Bank & Trust Co., 2001-2217 (La.4/3/02), 816 So.2d 270. See also Fusilier v. Dauterive, XXXX-XXXX (La.7/14/00), 764 So.2d 74.
Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. However, where documents or objective evidence so contradict the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based on a credibility determination. Rosell, supra. But where such factors are not present, and a fact finder's finding is based on its decision to credit the testimony of one or two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Salvant v. State, 2005-2126 (La.7/6/06), 935 So.2d 646.
*341 In a medical malpractice case, the plaintiff has the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
La. R.S. 9:2794(A); Salvant v. State, supra.
Resolution of each of these inquiries are determinations of fact which should not be reversed on appeal absent manifest error. Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La. 1991).
Where there are conflicting expert opinions concerning the defendant's compliance with the standard of care, the reviewing court will give great deference to the conclusions of the trier of fact. Pinnick v. Louisiana State University Medical Center, 30,263 (La.App.2d Cir.2/25/98), 707 So.2d 1050.
Dr. Cooksey testified that he had taken care of Mr. Tanner's eyes since 1992. In 1997, he began suggesting that the cataract in the right eye be removed. This suggestion was made several times over the years as the cataract in the right eye worsened. After an office visit on November 20, 2000, Dr. Cooksey again suggested surgery on the right eye and Mr. Tanner agreed. At that time, Mr. Tanner's left eye was correctable to 20/50 and his right eye was correctable to 20/30. Dr. Cooksey recommended the ECCE surgery due to the degree of thickening of the cataract.
Surgery was performed on December 14, 2000. During the course of the surgery, the posterior capsule ruptured, causing bleeding in the eye. Dr. Cooksey performed a vitrectomy in response to this complication. According to Dr. Cooksey, the rupture of the posterior capsule made a retinal tear or detachment more likely.
The next day, when the optometrist in Dr. Cooksey's office saw Mr. Tanner, there was blood between the cornea and the lens in front of the iris. Mr. Tanner could only perceive light with the right eye. He was given an appointment to return to see Dr. Cooksey.
At that appointment on December 20, 2000, Mr. Tanner could only see hand motions. Dr. Cooksey perceived this to be an improvement from light perception only. He thought that Mr. Tanner's poor vision was due to blood in the front part of the eye, and that when the blood was absorbed, his vision would improve. Dr. Cooksey did not dilate the eye, but got an indication that the retina was attached. Mr. Tanner was instructed to return in one week.
On December 27, 2000, Mr. Tanner reported that he had experienced a slight improvement in his vision a few days previously, but it did not last. At that point, *342 Mr. Tanner could still see only hand motions. Dr. Cooksey did not dilate the eye out of concern that it would reactivate bleeding. He noted that Mr. Tanner had a small blood clot in the eye. Dr. Cooksey did not refer to a retinal specialist because he thought Mr. Tanner was continuing to improve. According to Dr. Cooksey, he did not find any clinical indication of a problem with the retina. He stated that he could see a red reflex in the back of the eye which indicated that the retina was attached. He thought he could see the retina "pretty well" without having to dilate the eye.
On January 2, 2001, Mr. Tanner had 20/400 vision in his right eye. On January 8, Dr. Cooksey saw a portion of the back of the eye and thought the eye was continuing to improve. He believed that when the blood cleared, the plaintiff would be able to see.
Dr. Cooksey again saw Mr. Tanner on January 15, 2001. At that time he had become concerned that Mr. Tanner might have a choroidal detachment and referred him to a retinal specialist, Dr. Joseph B. Barron.
Dr. Cooksey testified that he disagreed with the medical review panel opinion that he should have referred Mr. Tanner to a retinal specialist by December 27. He opined that the retina detached between January 8 and January 15 and could not have been diagnosed any earlier.
Dr. Barron testified that when he saw Mr. Tanner on January 15, he noted an afferent defect when the pupil does not react to light. This indicates a possible problem in the back of the eye. He observed a retinal detachment in the right eye which was confirmed with a B-scan test.
Dr. Barron testified that a rupture of the posterior capsule increases the risk of a retinal detachment. He stated that he does not know when the retina detached or if the delay in referring the patient caused harm.
Dr. Barron performed surgery to reattach the retina on January 18, 2001. A gas bubble was placed in the eye to hold the retina in place. About a month later when the bubble dissipated, the retina detached again. Additional surgery was performed on March 8, 2001, but the vision was not restored to the eye. A type of oil was placed in the eye to replace the vitreous. This substance was removed later because it was causing the cornea to decompose.
Dr. Barron eventually referred Mr. Tanner to Dr. Thomas B. Redens, a cornea specialist. He first saw Mr. Tanner on April 28, 2001. He noted that Mr. Tanner had 20/200 vision in the left eye and keratitis, or dry eye. Dr. Redens began treating Mr. Tanner for dryness in both eyes which was limiting his vision and causing discomfort.
Dr. Redens observed a pallor or whiteness of the optic nerve in the right eye which he attributed to surgical trauma. He noted the presence of a scleral buckle, a surgical device to hold the retina in place, as well as substantial scarring in the macula. He observed that the vitreous in the right eye was silicone oil from a previous surgical manipulation. Dr. Redens also noted decomposition of the cornea in the right eye which he thought was caused by the silicone oil. Dr. Redens stated that corneal decomposition can cause painful blisters on the eye.
Dr. Redens performed a corneal transplant to improve the vision in the right eye. This procedure did not improve Mr. Tanner's vision. Dr. Redens stated that Mr. Tanner has macular degeneration and that this condition and his corneal pathology were significant contributing factors in *343 Mr. Tanner's decreased vision. He opined that the surgery by Dr. Cooksey did not cause the ultimate corneal decomposition, but it was a contributing factor.
Dr. Stephan K. Cooper, a member of the medical review panel, testified on behalf of the plaintiffs. Dr. Cooper, an expert in ophthalmology, testified that the medical review panel found that Dr. Cooksey breached the standard of care by failing to refer Mr. Tanner to a retinal specialist by the December 27 office visit. It was noted that Mr. Tanner had persistent hyphema (blood in the eye) which obscured the retina.
According to Dr. Cooper, because of the posterior capsule rupture during the cataract surgery, vitreous material came forward. If not removed, there was a risk of complications, including retinal detachment. A reasonable time to wait for the vision to clear up after the surgery was two weeks. Dr. Cooper stated that the standard of care required that if the back of the eye could not be seen within seven to 14 days, the patient should be referred to a retinal specialist. According to Dr. Cooper, a B-scan was necessary to examine the back of the eye due to the blood in the anterior portion. Dr. Cooper said that the panel did not have sufficient information to determine whether the breach in the standard of care may or may not have contributed to a different outcome.
Dr. Robert Lamburg, an ophthalmologist in Missouri, testified on behalf of the plaintiffs. He stated that the follow-up care rendered by Dr. Cooksey on December 20, 2000 was appropriate. He found no fault with the decision not to dilate the eye at that point. However, by the second week after cataract surgery, the risk of causing a hemorrhage from dilation would be small. Because Mr. Tanner could not see after the clot began to clear, that was an indication that there was something wrong in the eye. On December 27, the standard of care required that the eye be dilated. According to Dr. Lamburg, just because Dr. Cooksey could see blurred details in the back of the eye on January 8, 2001, did not mean that the retina was still attached. He points out that the eye was not dilated, and half of the retina could have been detached without Dr. Cooksey being able to see it. He opined that Dr. Cooksey should have either dilated the eye or gotten a B-scan. He noted that in this matter, there was a prolonged period of poor vision with no investigation as to the reason.
Dr. David Newsome, an ophthalmologist from New Orleans, testified that the delay in getting Mr. Tanner to a retinal specialist contributed directly to Mr. Tanner's loss of any functional vision in his right eye. Dr. Newsome noted that prior to the surgery, Mr. Tanner had 20/30 vision in his right eye. After the surgery, he could barely see light. According to the record, there was blood in the front of the eye, partially blocking the pupil, the eye pressure was high and by December 27, Mr. Tanner still could only see hand motion, even though the clot was clearing. Dr. Newsome said that these factors should have been a red flag that there was something wrong in the eye that required thorough examination. Dr. Newsome stated that there was scar tissue on the surface of the retina known as proliferative vitreous retinopathy. He claimed that it generally takes four to six weeks for this to form and the presence of this tissue indicates that the retinal problems had been present for several weeks. Dr. Newsome opined that the retina detached at surgery or very soon thereafter. He said that the failure to get a B-scan breached the standard of care. If the retinal detachment had been diagnosed and treated earlier, more probably than not, Mr. Tanner *344 would have better vision. He stated that there was no danger in dilating the eye by December 27. He claimed that earlier dilation would have led to earlier detection of the retina problem.
Dr. Michael Holy, a retinal specialist, testified on behalf of Dr. Cooksey and disagreed with the conclusion of the medical review panel. He stated that there was no way to know when the retina detached or whether surgery on December 27, 2000, would have changed the outcome for Mr. Tanner. Noting that on December 20, Mr. Tanner could only see hand motions, Dr. Holy said this was explained by the blood in the eye that would usually absorb if left alone.
He testified that on the December 27 visit, the most obvious reason for Mr. Tanner's poor vision was the large hemorrhage in the anterior chamber of the eye. He stated that because there was an obvious reason for Mr. Tanner's poor vision, Dr. Cooksey was not required to investigate every other potential reason for the problem. According to Dr. Holy, the proper treatment was watchful waiting. By January 2, 2001, Mr. Tanner was seeing better later in the day. According to Dr. Holy, this could have been attributable to the blood in the eye settling while Mr. Tanner was in an upright position.
On January 8, when the clot was getting smaller, and Dr. Cooksey claimed to be able to see blurred details at the back of the eye, Dr. Holy believed that Dr. Cooksey had taken reasonable steps in caring for this patient. Dr. Holy felt that on January 15, when Dr. Cooksey saw something on the back of the eye that did not look right, he acted properly in referring Mr. Tanner to Dr. Barron.
Dr. James Lusk was a member of the medical review panel and voted that Dr. Cooksey violated the standard of care in this case. However, upon reexamining Mr. Tanner's medical records and having access to depositions given by Dr. Cooksey, Dr. Lusk changed his opinion. Dr. Lusk felt that everything that was done in this case was not documented in the medical records. He stated that he mostly relied upon Dr. Cooksey's clinical findings. According to those findings, Dr. Cooksey doubted that there was a retinal detachment earlier than January 15.
On December 27, Dr. Cooksey saw a red reflex in the back of the eye, indicating that the retina was still attached. According to Dr. Lusk, there was an improvement and possibly a resolution of some of the vitreous blood allowing Dr. Cooksey to see the red reflex in the back of the eye.
Dr. Lusk noted that on the January 8, 2001 visit, Dr. Cooksey saw blurred detail on the fundus of the right eye. According to Dr. Lusk, if there had been a retinal detachment at that time, it would have been visualized. The medical records indicated that retinal detail was seen which indicated that the retina was attached. Dr. Lusk stated that this was an item in the medical records that he missed the first time he examined them. Dr. Lusk opined that the detachment happened after January 8. Dr. Lusk stated that, based upon the January 8 visit, Dr. Cooksey was able to rule out a retinal detachment "at least in the important posterior part of the retina." Dr. Lusk stated that he did not know if Mr. Tanner would have had a better outcome if he had been dilated and examined earlier.
In this case, the jury was presented with conflicting expert evidence about compliance with the standard of care. Drs. Cooper, Lamburg, and Newsome found that Dr. Cooksey breached the standard of care by not investigating the reason for Mr. Tanner's poor vision by December 27. Dr. Cooper stated that Dr. *345 Cooksey could not see the retina because of blood in the eye and therefore should have referred Mr. Tanner to a retinal specialist to perform a B-scan of the eye. According to Dr. Cooper, two weeks was a reasonable time to wait for the vision to clear.
Dr. Lamburg testified that by December 27, when there was no improvement in Mr. Tanner's vision, that was an indication that something was wrong. At that point, the eye should have been dilated or a B-scan performed. Dr. Lamburg stated that part of the retina could have been detached and not been visible because only blurred details were observed in the back of the eye.
Dr. Newsome stated that Mr. Tanner's continued poor vision when the clot was clearing was a red flag that something was wrong in the eye that required thorough examination. He claimed that the eye should have been dilated and examined by December 27. He also found that the scar tissue in the eye usually takes several weeks to form, indicating that the retina detached at surgery or soon thereafter.
On the other hand, Drs. Holy and Lusk found that there was no breach of the standard of care, and that there were indications that the retina was intact as late as January 8, 2001. Dr. Holy stated that there was no way to know when the retina detached and the most obvious reason for Mr. Tanner's poor vision was the blood in the eye. He said that Dr. Cooksey was not required to investigate every other potential reason for the problem and that Dr. Cooksey referred Mr. Tanner to a retinal specialist as soon as he saw a problem, which was on January 15, 2001.
Dr. Lusk testified that upon further reflection on the medical records and after reviewing Dr. Cooksey's deposition, the fact that Dr. Cooksey saw a red reflex on December 27 indicated that the retina was attached. On January 8, Dr. Cooksey saw blurred detail on the back of the eye, again showing that there was no retinal detachment at that time. He concluded that the detachment must have occurred after January 8, 2001.
Further, Dr. Barron testified that there was no way to know when the retina detached.
It is extremely regrettable that Mr. Tanner did not have a good result from his cataract surgery. However, in this matter, the jury was presented with two permissible views of the evidence regarding whether Dr. Cooksey should have referred Mr. Tanner to a retinal specialist after the December 27 visit. The jury obviously chose to credit one group of experts over another. The objective evidence does not contradict that finding. Accordingly, we do not find that the jury verdict in favor of Dr. Cooksey was manifestly erroneous or clearly wrong.

CONCLUSION
For the reasons stated above, we affirm the jury verdict in favor of the defendants, Dr. John C. Cooksey and his insurer, Ophthalmic Mutual Insurance Company, finding that Dr. Cooksey did not breach the standard of care applicable to ophthalmologists in this case and dismissing the claims of the plaintiffs, Louis Jackson Tanner and Ottomese Tanner. Costs in this court are assessed to the plaintiffs.
AFFIRMED.
NOTES
[1] The medical review panel found:

The evidence does support the conclusion that the defendant, DR. JOHN C. COOKSEY, failed to meet the applicable standard of care in the treatment of LOUIS J. TANNER as charged in the complaint. The reason for this conclusion by the PANEL is that:
1) In view of the patient's persistent hyphema and the inability to examine the retina, DR. COOKSEY should have referred the patient to a retina specialist by the December 27th visit.
In complicated cases like this, it is not uncommon for the patient to have a significant reduction in vision even without a detached retina. The most common cause for decreased vision is cystoid macular edema with eventual permanent damage to the macula. The delay in DR. COOKSEY referring this patient to a retina specialist may or may not have contributed to a different outcome; however, this Panel does not have sufficient information to make that determination and would defer to a retina specialist.
[2] La. C.C.P. art. 1672, dealing with motions for involuntary dismissal, provides in pertinent part:

B. In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence. [Emphasis supplied.]
[3] In pretrial proceedings, the plaintiffs filed a motion to strike the defendants' affirmative defense of patient fault and a motion in limine. The trial court denied the motion to strike and deemed the motion in limine to be moot.
[4] The plaintiffs concede in their brief that, because there were two permissible views of the evidence, the jury was not manifestly erroneous in finding that Dr. Cooksey did not breach the standard of care in recommending cataract surgery. On appeal, they argue only that he breached the standard of care in failing to refer Mr. Tanner to a retinal specialist earlier.