STEWART, J.
hThe plaintiff, Jessica Phillips, filed suit for damages against the defendant, Oua-chita Parish Sheriff Richard Fewell. She alleged that she developed sores on her ankles as a result of remaining shackled for an extended period of time and was not provided any medical treatment while held at the Ouachita Parish Correctional Center (O.C.C.). At the close of plaintiffs case, the defendant moved for a directed verdict. The trial court took no action on the motion, and the defendant presented its evidence. At the close of the trial, the trial court took the matter under advisement and later rendered a judgment granting a directed verdict in favor of the defendant. The plaintiff appealed. Because we find the trial court erred in granting the directed verdict, we reverse the trial court’s judgment and, upon reviewing the record de novo, render in favor of the plaintiff as set forth in this opinion.
FACTS
On April 1, 2004, Jessica Phillips was arrested for simple burglary by the Monroe Police Department. After first being taken to Richwood Detention Center, she was transported to O.C.C., booked, and placed in a holding cell shortly after midnight where she remained until late afternoon on April 3, 2004. During her entire time in the holding cell, she wore shackles around her ankles. Jessica claimed that she complained the shackles were hurting her but that no one helped. She developed ugly sores on the backs of both ankles where the skin was rubbed raw from contact with the metal shackles.
|2Jessica filed suit against the State of Louisiana Department of Public Safety and Corrections (“DPSC”) and Richard Fewell, the Ouachita Parish Sheriff. Because DPSC did not exercise control over O.C.C., Jessica’s claims against it were dismissed on summary judgment. A bench trial was held on Jessica’s claims against Fewell on July 23, 2007.

Trial Testimony

Jessica testified no one responded to her complaints while in the holding cell, even though she pressed a buzzer for help three times and tried to get the attention of deputies as they brought other women in and out. No one looked at her ankles or loosened the shackles. Late in the day on April 3, 2004, the shacMes were finally removed after her transfer to the women’s dormitory. Jessica testified that the skin was rubbed off the backs of her ankles, leaving green and yellow looking sores that bled. She said that her ankles hurt and were “horrible.” Though she asked for medical assistance “numerous times,” none was provided.
No prior injuries to Jessica’s ankles are noted on the health intake done by O.C.C. during booking. The O.C.C.’s records also indicate an “H & P done per MD Twite-hell” at 8:00 a.m. on April 6, 2004. Two hours later at 9:50 a.m., Jessica filed O.C.C.’s Administrative Remedy Procedure (“ARP”) on which she complained of *1226 sores on her ankles from the shackles and wrote:
On April 1, 2004 I was arrested. They put me in holding tank B3, with [shackles] on. I stayed in the tank until that Sat. night. The whole time I was in the tank I had the [shackles] on with no socks. The [shackles] started cutting into my ankles. I brought it to several different people’s attention, including the nurse. They never once put any kind of cream or [bandages] |3on them. Now they are infected <& swole up [sic]. When I ask them or go to show them for something to put on them all they do is look at me like “Oh my God.” This morning I spoke to Sgt. Davis & he told me to fill out an ARP.
The shift supervisor, Sgt. Newman, responded to the ARP by writing, “Jessica Philips, I don’t know anything about your complaint. You did not say anything to me concerning your ordeal.” Jessica felt she had no choice but to accept the decision, because no one had done anything to help her.
O.C.C.’s records also include a sick call request filed by Jessica at 10:00 p.m., on April 8, 2004. She was finally seen by a nurse on April 9, 2004. The nurse looked at both ankles and noted “minor abrasions” but no “swelling or signs of infection.” She told Jessica the sores were “healing well” and “instructed her to clean with soap and water — apply TAD once a day.”
Later that day, Jessica was transferred to Richwood Detention Center and then to Richland Parish Detention Center (“Rich-land”) at 12:54 a.m., on April 10, 2004. Jessica reported to Richland that O.C.C. left her shackled for three days. Her injuries were documented by photographs, and Althea Smith, a certified nursing assistant, treated the wounds with antibiotic cream and bandages.
After her release, Jessica continued to treat her wounds at home. Believing that the sores were infected and not healing, she sought treatment at St. Francis Medical Center’s emergency room on April 23, 2004. Medical records state no signs of infection were found. Jessica was told to apply Neosporin or a similar ointment daily to the drying scabs. Jessica testified that she could not wear tennis shoes for two to three months. She [ testified that her ankles are scarred and that she has some discomfort when wearing shoes due to the skin on the backs of her ankles now feeling “thin.”
Althea Smith, the CNA who treated Jessica at Richland, identified the photographs of Jessica’s wounds, but she had no independent recollection of Jessica. Janet L. Philips, Jessica’s mother, also took photographs of Jessica’s ankles after her release. Janet testified that the wounds looked infected and did not appear to be healing.
At the close of Jessica’s case, the defendant moved for a directed verdict. He argued that Jessica’s case was based on the failure of O.C.C. to provide medical treatment and that she did not prove, particularly without presenting any expert medical testimony, that the failure to do so either caused or increased her injury. In response, Jessica’s counsel argued that her claim included both the failure to provide medical treatment and the failure to “attend to her when her shackles were too tight.” He argued that had O.C.C.’s personnel either adjusted the shackles or provided medical care when the injuries occurred, the sores would not have been as bad. Rather than ruling on the motion, the trial court took the matter under advisement, and the trial proceeded.
Fewell presented the testimony of Captain Connie Murray, Deputy Vicky *1227 Christy, Deputy Patricia Hopkins, and Sgt. Belinda Newman. None of these witnesses from O.C.C. could recall the plaintiff. Connie Murray logged in Jessica’s arrival at O.C.C. She described the booking area where the holding cell was located as “wild” and “hectic.” According to Murray, all inmates wear shackles while in the holding cell to prevent escapes in the | fihigh traffic area. She testified that there is a buzzer in the holding cell that sounds in Master Control when an inmate needs something. Murray testified that they are often called to loosen shackles, so all personnel have keys to the shackles. When shown pictures of Jessica’s injuries, Murray stated that she had never seen abrasions like that on an inmate. She explained that a person might be kept in the holding cell for a longer period if waiting on a bond. However, there was no evidence that Jessica was kept in the holding cell for this reason. Vicky Christy’s testimony was similar to Murray’s testimony regarding what happens in the fast-paced booking and holding cell area.
Patricia Hopkins worked in the female dormitory in April 2004. She logged Jessica’s clothing when she changed to the dormitory uniform. Hopkins testified that she did not recall any complaints by Jessica; however, she had no independent recollection of her. She testified that the prisoners “dress out” all during the night as soon as the paperwork for booking is done. She stated that prisoners are usually “dressed out” within 24 hours of arrival. She did not know why anyone would be kept in the holding cell as long as Jessica was kept there, but she did state that prisoners remain shackled while in the holding cell. Hopkins noted that females are not always wearing socks when they arrive, so they are more likely to get slight bruises or cuts from the shackles. However, she had not seen anyone with injuries as severe as Jessica’s appeared in the photographs.
Belinda Newman was the security sergeant for the female dormitory and the officer who responded to Jessica’s ARP. Newman testified that she lBcould not recall whether she had received any prior complaints by Jessica about her ankles. She also testified that she had been off work from March 21 through April 5, and had no knowledge of what occurred during that time. She claimed that she always returns an ARP in person and reads her decision to the inmate. If the decision is accepted, the matter goes no further. She also claimed that anytime she receives an ARP and sees an injury, she calls for medical assistance. She testified that if she had seen an injury like that shown in the photographs of Jessica’s ankles, she would have called for medical assistance.
At the close of the defendant’s case, the trial court ordered post-trial briefing and took the matter under advisement. On August 21, 2007, he rendered a written ruling that granted a directed verdict in favor of the defendant. The trial court agreed with the defendant’s contention that Jessica sought at trial to expand her pleadings to include the claim that O.C.C. negligently placed her and left her in shackles that were too tight. The trial court determined that Jessica’s petition complained only of the failure to provide medical care. In sustaining the motion for a directed verdict, the court stated, “Had Plaintiff ‘pled’ otherwise, a different result may [sic] be warranted.” A judgment dismissing Jessica’s claim was rendered on August 21, 2007. Jessica’s appeal from the directed verdict in favor of the defendant followed.
DISCUSSION

Directed Verdict

A motion for a directed verdict is a procedural device available in jury trials. *1228 King of Hearts, Inc. v. Wal-Mart Stores, Inc., 27,137 (La.App.2d Cir.8/23/95), 660 So.2d 524. The motion is to be made at the close of the opposing party’s evidence. La. C.C.P. art. 1810. The trial court must consider all evidentiary inferences in the light most favorable to the nonmoving party. When the facts and inferences overwhelmingly favor a verdict in favor of the moving party, and it is clear that reasonable minds could not arrive at a different conclusion, the motion for directed verdict should be granted. King of Hearts, supra. The directed verdict procedure serves judicial economy. Id.
Because this matter was tried by a judge rather than a jury, use of the directed verdict procedure and granting of a directed verdict, especially at the close of trial, were in error. Rather than taking the motion under advisement when made by the defendant, the trial court should have evaluated the plaintiffs evidence in light of the standards set forth in the preceding paragraph and then determined whether to grant or deny the motion. Taking the motion under advisement until the end of trial, when a judgment on the merits based on all of the evidence should be rendered, makes the directed verdict procedure meaningless. Ordinarily, a trial court is accorded much discretion in its decision to grant a directed verdict. Clifton v. Coleman, 32,612 (La.App.2d Cir.12/23/99), 748 So.2d 1263, writ denied, 2000-0201 (La.3/24/00), 758 So.2d 151. The circumstances here compel the conclusion that the trial court abused its discretion in granting the directed verdict in favor of the defendant.
A procedure akin to the motion for directed verdict is provided for use in bench trials. The motion for an involuntary dismissal can be made at | sthe close of the plaintiffs ease on the grounds that the plaintiff failed to show a right to relief under the facts and law of the matter. La. C.C.P. art. 1672; King of Hearts, supra. In determining whether to grant a motion for involuntary dismissal, the trial judge evaluates the plaintiffs evidence without any special inferences favoring the plaintiff and determines whether the preponderance of the evidence establishes a prima facie case. Id.; Haworth v. L’Hoste, 95-0714 (La.App. 4th Cir.11/30/95), 664 So.2d 1335, writ denied, 96-0408 (La.3/29/96), 670 So.2d 1235. If so, an involuntary dismissal is not granted, and judgment is not rendered until the close of all the evidence presented. Because the trial court did not render judgment until the close of all the evidence in this case, we will not review its judgment under the standards for an involuntary dismissal.
Even considering the merits of the trial court’s judgment, we find error. Both the defendant’s argument for a directed verdict and the trial court’s judgment narrowly interpreted Jessica’s petition as claiming only that the defendant failed to provide medical treatment. Every pleading shall be construed so as to do substantial justice. La. C.C.P. art. 865. Pleadings must be interpreted to allow the petitioner his day in court so long as the opposing party is not prejudiced. Hinds v. Poo-Yie’s, Inc., 520 So.2d 1016 (La.App. 3d Cir.1987). If the pleadings are so insufficient or inadequate that they fail to put the opposing party on notice of the claims asserted, then prejudice occurs. Id.
Jessica’s petition alleged that she “remained shackled at both legs” while at O.C.C., and that she “asked a nurse at the facility to look at the | nsores on her ankles as a result of wearing the shackles for a long period of time, but the nurse refused saying it was not her job.” Jessica further alleged that her injuries were caused by the defendant’s failure to provide medical care, failure to act responsibly toward her *1229 medical needs, and indifference to her medical needs and welfare. Read as a whole, her petition put the defendant on notice that her claim related to the cause of the injuries to her ankles and the failure to provide medical care for the injuries. The trial court erred in narrowly interpreting the petition to state only a claim relating to the failure to provide medical care.
Because we find that the trial court erred as a matter of law in granting a directed verdict and as a matter of fact in its interpretation of the petition, we will conduct a de novo review of the entire record, which is complete, to render a judgment on the merits. See We Sell Used Cars, Inc. v. United Nat. Ins. Co., 30,671 (La.App.2d Cir.6/24/98), 715 So.2d 656.

De Novo Review

 To prevail on a negligence claim, the plaintiff must prove that the defendant owed a duty to the plaintiff, that the defendant breached the duty, that the breach was the cause of the plaintiffs injuries, and that the plaintiff sustained damages. Johnson v. Bennett, 27,051 (La.App.2d Cir.6/21/95), 658 So.2d 712; Vig v. City of Shreveport, 28,530 (La.App.2d Cir.8/21/96), 679 So.2d 524, unit denied, 96-2285 (La.11/15/96), 682 So.2d 775.
 The duty element is easily satisfied. A police officer owes a duty to a person in custody to protect him from injury and to care for his safety. Evans v. Hawley, 559 So.2d 500 (La.App. 2d Cir. 1990), writ denied, 563 So.2d 1156 (La. 1990); Saine v. City of Scott, 2002-265 (La.App. 3d Cir.6/12/02), 819 So.2d 496. An officer also has the duty to see that reasonable medical care is provided to a person in his custody when the need for such care is indicated by the person’s mental or physical condition. Evans v. Haw-ley, supra; Cobb v. Jeansonne, 50 So.2d 100 (La.App. 2d Cir.1951).
The defendant breached the duties owed to the plaintiff while in custody. The record establishes that Jessica remained shackled for over 36 hours. She complained the shackles hurt, but no one responded. The shackles rubbed away the skin on both ankles, leaving ugly sores that bled. Jessica’s testimony regarding her time in the holding cell and her complaints was uncontradicted. None of O.C.C.’s witnesses specifically recalled Jessica. Testimony established that the holding cell area is very hectic and wild, but that prisoners are generally transferred to the dormitory soon after booking is complete. This did not happen in Jessica’s case. Though testimony on the time lapse between booking and transfer was not specific, none of the witnesses could clearly explain why Jessica would have remained in the holding cell for such a long period. The booking paperwork in the record shows that it was generated in the early morning hours after her arrest, yet Jessica remained shackled until late afternoon on April 3, 2004, before being moved to the female dormitory. This is unacceptable.
Jessica also testified that she asked for medical assistance numerous times and was ignored. We note O.C.C.’s records show that Jessica was Inseen by a doctor at 8:00 a.m. on April 6, for an exam, and that there is no mention of injury to her ankles. Jessica testified that she did not recall any examination by a doctor. We do not find the record of a doctor’s visit to undermine Jessica’s claim. Later that same day, she filed the ARP, in which she related her injury and her unsuccessful efforts to get some medical assistance. Had she been able to get any medical treatment from a visiting doctor that morning, surely the ARP would have been unnecessary. The defendant’s pattern of *1230 indifference is shown in the response to the ARP, by which Sgt. Newman said that she did not “know anything” about Jessica’s complaint and that Jessica had not said anything to her concerning the “ordeal.” This response to a claim of injury by a prisoner is also unacceptable. Finally, Jessica filed a sick call request at 10:00 p.m., on April 8, 2004, complaining that her ankles appeared infected. She was seen by a nurse on April 9, 2004, the day of her transfer to Richland. The nurse told her to clean the wounds with soap and water.
Overall, the record establishes indifference by O.C.C. to the safety and medical needs of Jessica. O.C.C. allowed her to remain in shackles for over 36 hours. As a result of being shackled for this extended period, Jessica developed sores on both ankles from the metal rubbing against bare skin. Her complaints were ignored until the day she left O.C.C. Lacking treatment, Jessica became concerned that the wounds were becoming infected. Fortunately, infection did not develop. The defendant clearly breached its duty to protect a person in its custody from injury and to provide medical care as indicated by the person’s physical condition. It was |1g;O.C.C.’s failure to pay attention to how long Jessica remained in the holding cell and to respond to her complaints about the shackles that caused the injuries to her ankles. Also, O.C.C.’s failure to provide any medical treatment until Jessica’s last day in the facility caused her to suffer with untreated wounds and fear that they were becoming infected. The record establishes that Jessica sustained damages, and we must determine the appropriate compensation.
After her release from Richland, Jessica sought treatment from St. Francis Medical Center on April 23, 2004, to check for infection. Her injuries were minor, though she claimed to experience some tenderness for two to three months when wearing shoes. She claimed at trial to still have scars on her ankles. Though the record indicates that she showed her ankles to the trial judge, the record does not state any comment by the trial judge regarding the extent of any scarring. Considering the injuries sustained by Jessica as a result of the negligent indifference exhibited by O.C.C. personnel in keeping Jessica shackled for over 36 hours and by not responding in a timely manner to her pleas for medical care, we award general damages of $2,000. Additionally, the defendant is ordered to pay special damages totaling $189.94 for medical and related expenses.
CONCLUSION
For the reasons stated, the judgment of the trial court is reversed, and judgment is rendered in favor of the plaintiff, Jessica Phillips, for a total of $2,189.94. In accordance with La. R.S. 13:5112, we assess costs of this appeal totaling $975 against the defendant.
REVERSED AND RENDERED.